James S. O'Brien, Jr. (jobrien@pryorcashman.com)
Benjamin S. Akley (bakley@pryorcashman.com)
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
*Attorneys for Plaintiffs*

JUDGE BATTS

13 CV 1013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

FORMER MEMBERS OF THE BOARD OF
DIRECTORS OF THE PARK AVENUE
BANK: DONALD G. GLASCOFF JR., BRUNO
DE VINCK, FREDERICK KELLER, ANGELA
MIRIZZI-OLSEN, EDWARD L. BEYER and
MENDEL ZILBERBERG,

           Plaintiffs,

- against -

ONEBEACON MIDWEST INSURANCE
COMPANY and ONEBEACON AMERICA
INSURANCE COMPANY,

           Defendants.

------------------------------------------------------------ x

**COMPLAINT**



Plaintiffs the former members of the Board of Directors of The Park Avenue Bank,

Donald G. Glascoff Jr., Bruno De Vinck, Frederick Keller, Angela Mirizzi-Olsen, Edward L.

Beyer and Mendel Zilberberg ("Plaintiffs"), by their attorneys, Pryor Cashman LLP, as and for

their Complaint against defendants OneBeacon Midwest Insurance Company and OneBeacon

American Insurance Company (collectively, "OneBeacon"), allege as follows:

## NATURE OF DISPUTE

1.    This action concerns Plaintiffs' entitlement to insurance coverage under a

directors and officers professional liability insurance policy issued by OneBeacon naming

Plaintiffs as insured parties.

2.    Plaintiffs seek reimbursement for their costs and attorneys' fees incurred in

defending an action brought against them in their capacity as former directors and officers of The

Park Avenue Bank ("PAB") by two entities owned by Dr. Bruce Kingsley ("Kingsley"), who alleged that he was convinced by Charles Antonucci ("Antonucci"), PAB's former President and Chief Executive Officer, to invest (through wholly-owned entities) in a fraudulent scheme from which Antonucci personally benefitted (the "Underlying Action").

3.      Kingsley alleged that Plaintiffs were liable for his losses under Arizona statutory and common law because  they failed to oversee and manage Antonucci and PAB in accordance with their duties and responsibilities as directors of PAB.

4.      The Underlying Action relates back to an earlier claim against Plaintiffs brought by the FDIC that was noticed to Defendants within the reporting period of the insurance policy (the "FDIC Claim").

5.      Specifically, the FDIC Claim alleged that Plaintiffs were liable for losses the FDIC suffered as a result of Antonucci's fraudulent conduct because Plaintiffs failed to oversee and manage Antonucci and PAB in accordance with their duties and responsibilities as directors of PAB.

6.      Plaintiffs gave notice of the FDIC Claim to Defendants within the reporting period of the insurance policy.

7.      The insurance policy treats "Interrelated Wrongful Acts" as a single wrongful act.

8.      The FDIC Claim and the Underlying Action concern Plaintiffs' "Interrelated Wrongful Acts," and Defendants were given notice of the Underlying Action within the reporting period of the insurance policy and must provide insurance coverage to Plaintiffs in their defense of the Underlying Action.

## PARTIES

9.      Plaintiff Donald G. Glascoff Jr. ("Glascoff") is an individual residing at 50 West 72nd Street, Apt. 1005, New York, New York 10023 and is the former Chairman of the Board of Directors of PAB.

2

10.     Plaintiff Bruno de Vinck ("de Vinck") is an individual residing at 128 South Central Avenue, Ramsey, New Jersey 07446 and is a former Member of the Board of Directors of PAB.

11.     Plaintiff Frederick Keller ("Keller") is an individual residing at 11 Fifth Avenue, Apt. 11D, New York, New York 10003 and is a former Member of the Board of Directors of PAB.

12.     Plaintiff Angela Mirizzi-Olsen ("Mirizzi-Olsen") is an individual residing at 24 Leslie Avenue, Staten Island, New York 10305 and is a former Member of the Board of Directors of PAB.

13.     Plaintiff Edward L. Beyer ("Beyer") is an individual residing at 1934 Frederick Avenue, Merrick, New York 11566.

14.     Plaintiff Mendel Zilberberg ("Zilberberg") is an individual residing at 1430 55th Street, Brooklyn, New York 11219  and is a former Member of the Board of Directors of PAB.

15.     Defendant OneBeacon Midwest Insurance Company ("OMI") is an insurance company incorporated under the laws of Wisconsin, with its principal place of business in Massachusetts.  OMI issued a Management and Professional Liability policy (Policy No. 474-00-06-11-0000) (the "Policy") to PAB's parent, Park Avenue Bancorp, Inc. ("PA Bancorp").

16.     Defendant OneBeacon America Insurance Company ("OAI") is an insurance company incorporated under the laws of Massachusetts with its principal place of business in Massachusetts.  OAI issued a Financial Institution Bond No. 474-00-06-11-0000 (the "Bond," and, together with the Policy, the "OneBeacon Coverage") to PA Bancorp.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest

3

and costs, and there is a complete diversity of citizenship between Plaintiffs and OneBeacon, as alleged herein.

18.    Venue is proper is this District pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events or omissions giving rise to the claims occurred, and a substantial part of the property that is the subject of this action is situated, in this District, as alleged herein.

## FACTUAL ALLEGATIONS

### Background of PAB

19.    PAB was established in 1987.

20.    PAB was recapitalized in 2004, had an ownership change, and became chartered in New York under the supervision of the New York State Banking Department. Since 2004, PAB was headquartered at 460 Park Avenue in Manhattan. It had a total of four retail branches located in Manhattan and Brooklyn. It was primarily a small business bank that provided commercial and real estate loans.

21.    From June 2004 until October 2009, Antonucci was PAB's President and Chief Executive Officer. He also was one of its directors. He remained in those positions until his resignation on October 30, 2009.

### The OneBeacon Coverage

22.    In 2008, PAB, through PA Bancorp, desired to purchase both professional liability insurance for its directors and managers and a financial institution bond and, through a broker, began negotiations with OneBeacon.

23.    OneBeacon issued the Policy and the Bond on September 16, 2008 with an initial coverage term of September 9, 2008 to September 8, 2009. (**Exhibit "A"**).

24.    By subsequent endorsement, the coverage term was extended to November 9, 2009.

25.     PAB also purchased Extended Reporting Period ("ERP") endorsements which were endorsed to the OneBeacon Coverage on October 29, 2009. The ERP endorsements extended the reporting period under the OneBeacon Coverage to November 9, 2010. Thus, any claims under the OneBeacon Coverage were required to have been made on or between September 9, 2008 and November 9, 2010.

26.     The Policy defines "Insured" to include, *inter alia*, "Insured Persons" and defines "Insured Person" to include, *inter alia*, "any past present or future director... of the Financial Institution..."

27.     The Policy defines "Claim" to include, *inter alia*, "a civil proceeding commenced by the service of a complaint or similar pleading" and "a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document."

28.     The Policy defines "Wrongful Act" to mean, *inter alia*, "any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by... any Insured Person in the discharge of their duties while acting in the capacity as such..."

29.     The Policy defines "Interrelated Wrongful Acts" to mean "Wrongful Acts which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions."

30.     Under the Policy, "all Claims based upon or arising out of the same Wrongful Act or Interrelated Wrongful Acts committed by one or more Insureds shall be considered a single Claim... [which] shall be deemed to be first made on the date the earliest of such Claims was first made."

31.     Thus, if a Claim has been brought against an Insured for a Wrongful Act within the ERP, any Claim brought against an Insured for a Wrongful Act after the expiration of the

ERP still is covered under the Policy if it is based upon or arises from the same or Interrelated Wrongful Acts.

## PAB's Failure and Antonucci's Arrest and Conviction

32.    On March 12, 2010, the New York State Banking Department closed PAB and appointed the FDIC as receiver.  The FDIC immediately sold PAB's deposits and certain other assets to Valley National Bank, which reopened PAB's former locations as branches.

33.    On March 15, 2010, Antonucci was arrested on charges of attempting to defraud the Troubled Asset Relief Program ("TARP") by lying about PAB's capital levels, as well as several charges relating to alleged instances of self-dealing with PAB funds.

34.    Specifically, Antonucci was accused of concealing the extent of PAB's undercapitalization by a series of "round-trip" transactions that he claimed were investments of his personal wealth into PAB.

## The FDIC Claims Against Defendants

35.    The Plaintiffs each received a claim letter dated September 1, 2010 from the FDIC setting forth the FDIC Claim for:

> among other things, breach of duty (including but not limited to the fiduciary duties of due care and loyalty), negligence, and gross negligence in connection with your role in the failure of the Bank.  These claims generally arise from the **failure of PAB's directors and officers to supervise, manage,** conduct and direct the business and affairs of the Bank to ensure compliance with the law and all regulatory authorities, the by-laws and loan policies of PAB, and safe, sound and prudent banking principles.
>
> The FDIC currently estimates that its total loss in connection with the failure of PAB is approximately $50.7 million.  This loss results from breaches of duty, neglect, errors, misstatements, misleading statements, omissions or acts engaged in or permitted by you and other directors and officers including, but not limited to, the following:
> ***
> Failure to Act on Allegations Relating to Charles Antonucci: The FDIC alleges that **directors and officers failed to act on allegations of improper conduct made against former President and CEO of PAB, Charles Antonucci, ultimately causing significant financial harm to the Bank.**

6

(**Exhibit "B"**).  (Emphases Added).

36.    The FDIC Claim was communicated to OneBeacon by letter dated October 5, 2010.  (**Exhibit "C"**).  In response, OneBeacon sent a letter dated November 11, 2010 in which it admitted that it would "**treat the FDIC demand letters as claims** under the Policy."  (**Exhibit "D"**).  (Emphasis added).

**The Kingsley Claims Against Plaintiffs**

37.    On February 28, 2012 Kingsley commenced the Underlying Action in the District of Arizona.  (**Exhibit "E"**).

38.    As alleged in the Underlying Action, Antonucci and others induced Kingsley to invest money with Oxygen Investment Partners LLC ("Oxygen") in 2008, causing Kingsley to deposit $1.75 million into a PAB account belonging to Oxygen, supposedly to be held for insurance reserves.

39.    The Underlying Action alleges further that the funds from Kingsley to Oxygen allegedly were not held for insurance reserves but were, instead, used (along with other funds) as part of the same "round trip" transaction to which Antonucci pled guilty to fraud on the FDIC and bank fraud.

40.    Specifically, Antonucci and his co-conspirators (the same as those named in the information filed against Antonucci) allegedly convinced Kingsley to invest in Oxygen so that Oxygen could reduce the substantial overdrafts that it had accrued in its accounts at PAB, which would allow Oxygen to borrow more money from PAB that eventually would be "invested" in PAB by Antonucci.

41.    As part the effort to get Kingsley to invest, Antonucci allegedly caused PAB to issue letters of credit to Kingsley which were to act as security for Kingsley's investment.

42.    When PAB failed, Kingsley lost both his investment in Oxygen (which still owed substantial moneys to PAB) and his ability to draw on the PAB letters of credit.

43.     Kingsley sued Antonucci in a prior action in the District of Arizona and won a default judgment.

44.     Kingsley sued Plaintiffs for failing to **"act with due care as to their control of Antonucci** during the relevant period." (Emphasis added).

45.     Thus, Antonucci's alleged underlying misconduct – including the "round-trip" transaction and his personal use of PAB funds – and PAB's subsequent failure form the foundation of both the FDIC Claim and the Underlying Action.  Both the FDIC and Kingsley brought claims against Plaintiffs for their alleged failure to oversee and manage Antonucci and PAB in a manner that would have prevented his fraud and PAB's failure, so the FDIC Claim and the Underlying Action concern "Interrelated Wrongful Acts" and Plaintiffs are entitled to coverage under the OneBeacon Coverage because the Underlying Action relates back to the FDIC Claim.

**OneBeacon Declines Coverage for the Kingsley Action**

46.     By letter dated March 9, 2012 Defendants put OneBeacon on notice of the Underlying Action as an Interrelated Wrongful Act with the FDIC Claim.  (**Exhibit "F"**). Pursuant to that letter and because the Underlying Action was an Interrelated Wrongful Act with the FDIC Claim, Defendants requested that OneBeacon provide coverage for the Underlying Action.

47.     By letter dated August 16, 2012 OneBeacon declined to provide coverage for the Underlying Action.  (**Exhibit "G"**).

**FIRST CLAIM FOR RELIEF**
**(Declaratory Judgment)**

48.     Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 46 hereto.

49. OneBeacon and PAB (through PA Bancorp) had a valid insurance policy that covered Claims concerning allegations of Wrongful Acts by Plaintiffs, who are Insureds.

50. Plaintiffs properly notified OneBeacon of the FDIC Claim, which was based upon Plaintiffs alleged Wrongful Acts relating to their failure to oversee and prevent Antonucci's fraud and misconduct and the failure of PAB, within the ERP.

51. OneBeacon has admitted that the FDIC Claim constitutes a Claim under the OneBeacon Coverage.

52. Plaintiffs properly notified OneBeacon of the Underlying Action, which is based upon Plaintiffs' alleged Wrongful Acts relating to their failure to oversee and prevent Antonucci's fraud and misconduct and the failure of PAB.

53. Because the FDIC Claim and the Underlying Action are based upon allegations of the same or Interrelated Wrongful Acts by Plaintiffs, the Underlying Action relates-back to the FDIC Claim and Plaintiffs are entitled to coverage under the OneBeacon Coverage for their defense of the Underlying Action.

54. OneBeacon disputes that the FDIC Claim and the Underlying Action are based upon allegations of the same or Interrelated Wrongful Acts by Plaintiffs.

55. There is a justiciable controversy between the parties.

56. Plaintiffs are entitled to a declaratory judgment that the FDIC Claim and the Underlying Action are based upon allegations of the same or Interrelated Wrongful Acts by Plaintiffs and that Plaintiffs are entitled to insurance coverage for their defense of the Underlying Action under the OneBeacon Coverage.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

57. Plaintiffs restate and reallege the allegations contained in paragraphs 1 through 46 hereto.

9

58.   OneBeacon and PAB (through PA Bancorp) had a valid insurance policy that covered Claims concerning allegations of Wrongful Acts by Plaintiffs, who are Insureds.

59.   Plaintiffs properly notified OneBeacon of the Underlying Action, which is based upon Plaintiffs alleged Wrongful Acts relating to their failure to oversee and prevent Antonucci's fraud and misconduct and the failure of PAB.

60.   Because the FDIC Claim and the  Underlying Action are based upon allegations of the same or Interrelated Wrongful Acts by Plaintiffs, the Underlying Action relates-back to the FDIC Claim and Plaintiffs are entitled to coverage under the OneBeacon Coverage for their defense of the Underlying Action.

61.   OneBeacon has declined coverage for Plaintiffs in the Underlying Action, which is a breach of the OneBeacon Coverage.

62.   Plaintiffs have been damaged by OneBeacon's breach of the OneBeacon Coverage in an amount to be determined at trial but not less than $3,000,000, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter Judgment:

(a) Declaring that the FDIC Claim and the Underlying Action are based upon allegations of the same or Interrelated Wrongful Acts by Plaintiffs and that the Underlying Action is covered by the OneBeacon Coverage;

(b) Awarding Plaintiffs damages for OneBeacon's breach of the OneBeacon Coverage in an amount to be determined at trial but not less than $3,000,000, plus interest; and

(c) Granting Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      February 11, 2013

                      PRYOR CASHMAN LLP

                      By: _____
                        James S. O'Brien, Jr. (jobrien@pryorcashman.com)
                        Benjamin S. Akley (bakley@pryorcashman.com)
                      7 Times Square
                      New York, New York 10036
                      (212) 421-4100
                      *Attorneys for Plaintiffs*

# EXHIBIT A

**Professional @vantage**
<u>for Financial Institutions</u>



**Management and Professional Liability Policy**

OneBeacon Midwest Insurance Company

NOTICE: THIS IS A CLAIMS-MADE POLICY, AND, SUBJECT TO ITS PROVISIONS, APPLIES ONLY TO ANY CLAIM FIRST MADE DURING THE POLICY PERIOD. NO COVERAGE EXISTS FOR CLAIMS FIRST MADE AFTER THE END OF THE POLICY PERIOD UNLESS, AND TO THE EXTENT THAT, THE EXTENDED REPORTING PERIOD APPLIES. DEFENSE COSTS REDUCE THE LIMIT OF LIABILITY AND ARE SUBJECT TO THE RETENTION.

THE TERM 'INSURER' AS USED THROUGHOUT THE ATTACHED POLICY REFERS TO THE COMPANY PROVIDING THIS INSURANCE.

PLEASE REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

| Policy Number: | 474-00-06-11-0000 |
|---|---|

| | | |
|---|---|---|
| Item 1. | Name of Insured:<br>Principal Address: | PARK AVENUE BANCORP, INC.<br>FL 13<br>460 PARK AVE FL 13<br>NEW YORK, NY 10022-1906<br><br>Attn: Insurance Risk Manager |
| Item 2. | Policy Period: | 09/09/2008 to 09/08/2009<br>12:01 a.m. local time at the address stated in Item 1. |
| Item 3. | Policy Premium: | $43,301 |
| Item 4. | Policy Year Shared<br>Limit of Liability: | $5,000,000 |
| Item 5. | Extended Reporting Period:<br>    a. Period<br>    b. Premium | <br>12  months<br>75%  of Policy Premium |
| Item 6. | Notice of Claim<br>or Potential<br>Claim Address: | OneBeacon Midwest Insurance Company<br>Claim Reporting Unit<br>1 Beacon Lane<br>Canton, MA 02021<br>Phone: 877-624-2265<br>Fax: 877-624-6665<br>agtfnol@onebeacon.com |

3 4-63-0001 09/16/2008   L1B CPW PR 0.997

**Professional @vantage**
for Financial Institutions



Management and Professional Liability Policy

---

Item 7.   Endorsement(s)        See ASC 00 11 01 98, Schedule 1
          Effective at
          Inception:

---

Item 8.   Table of Limits
          Coverage is effective only for Insuring Agreements for which a Limit of Liability is set forth below.

| Item 8.a. Insuring Agreement | Item 8.b. Limit of Liability | Item 8.c. Retention | Item 8.d. Prior or Pending Date | Item 8.e. Subject to Policy Year Shared Limit of Liability |
|---|---|---|---|---|
| A.  Insured Persons Liability | $5,000,000 | $5,000 | 08/09/2005 | Separate |
| B.  Financial Institution Indemnification | $5,000,000 | $75,000 | 08/09/2005 | Shared |
| C.  Financial Institution Liability | $5,000,000 | $75,000 | 08/09/2005 | |
|   C1. IRA/Keogh Liability  Included ☒  Excluded ☐ | | $10,000 | 08/09/2005 | |
|   C2. Depositor Liability  Included ☒  Excluded ☐ | | $75,000 | 08/09/2005 | |
|   C3. Loss of Sensitive Customer Information<br>    Included ☒  Excluded ☐ | | $75,000 | 09/09/2008 | |
| D.  Employment Practices Liability | $2,000,000 | $50,000 | 08/09/2005 | Separate |
|   D1. Third Party Sexual Harassment<br>    Included ☒  Excluded ☐ | | | 08/09/2005 | |
| E.  Fiduciary Liability | $1,000,000 | $10,000 | 08/09/2005 | Shared |
| F.  Lender Liability | $3,000,000 | $75,000 | 08/09/2005 | Shared |
|   F1. Expanded Lender Liability<br>    Included ☒  Excluded ☐ | | | 08/09/2005 | |
| G.  Bankers Professional Liability | $3,000,000 | $75,000 | 08/09/2005 | Shared |
|   G1. Expanded Bankers Professional Liability<br>    Included ☒  Excluded ☐ | | | 08/09/2005 | |
|   G2. Insurance Services  Included ☐  Excluded ☒ | | | | |
|   G3. Broker/Dealer Services<br>    Included ☐  Excluded ☒ | | | | |
| H.  Trust Errors & Omissions | Not Covered | | | |

IN WITNESS WHEREOF, the Insurer has caused this Policy to be signed by its President and Secretary.

OneBeacon Midwest Insurance Company

_____          _____          _____09/16/2008_____
          President                        Secretary                              Date

---

Form Nos. SCB103, Ed. 01-06; SCB104, Ed. 01-06; SCB108, Ed. 01-06

# SCHEDULE 1

Effective 09/09/2008 , this schedule forms a part of Policy No. 474-00-06-11-0000
(At the time stated in the policy)
issued to

PARK AVENUE BANCORP, INC.

Producer: S.H. SMITH AND COMPANY, INC.

by OneBeacon Midwest Insurance Company

Declarations, SCB 103 01 06, Continued

Forms Applicable to the Professional Liability Coverage Part:

| | |
|---|---|
| SCB 002 01 06 | MANAGEMENT AND PROFESSIONAL LIABILITY POLICY COVERAGE FORM |
| SCB 103 01 06 | MANAGEMENT AND PROFESSIONAL LIABILITY DECLARATIONS |
| SCB 201 01 06 | NOTICE OF TERRORISM INSURANCE COVERAGE |
| SCB 405 01 06 | ADDITIONAL INSURED ENDORSEMENT |
| SCB 409 01 06 | AMEND ILLEGAL PROFIT EXCLUSION TO FINAL ADJUDICATION |
| SCB 662 01 06 | NEW YORK AMENDATORY ENDORSEMENT - REGULATION 121 |
| SCB 663 01 06 | NEW YORK AMENDATORY ENDORSEMENT - REGULATION 162 |
| SCB 664 01 06 | NEW YORK CHANGES - CANCELLATION & NONRENEWAL |
| SCB 665 01 06 | NEW YORK CHANGES - PROFESSIONAL LIABILITY POLICY |
| SCB 666 01 06 | NEW YORK AMENDATORY ENDORSEMENT - REGULATION 110 |
| ASC 00 10 01 98 | Policy Change 1 - SPECIFIC EVENT EXCLUSION |
| ASC 00 11 01 98 | Schedule 1 - LIST OF COMMUNITY BANKS FORMS |

3 4-63-0001 09/16/2008   L1B CPW PR 0.997

# Professional @vantage
## for Financial Institutions

### Management and Professional Liability Policy

I. INSURING AGREEMENTS
  A. INSURED PERSONS LIABILITY ...............................................................................2
  B. FINANCIAL INSTITUTION INDEMNIFICATION ......................................................2
  C. FINANCIAL INSTITUTION LIABILITY ......................................................................2
    C1. IRA/Keogh Liability ...........................................................................................2
    C2. Depositor Liability .............................................................................................2
    C3. Loss of Sensitive Customer Information ...........................................................2
  D. EMPLOYMENT PRACTICES LIABILITY ..................................................................2
    D1. Third Party Sexual Harassment .......................................................................2
  E. FIDUCIARY LIABILITY .............................................................................................3
    E1. Voluntary Correction Program .........................................................................3
  F. LENDER LIABILITY ..................................................................................................3
    F1. Expanded Lender Liability ................................................................................3
  G. BANKERS PROFESSIONAL LIABILITY ..................................................................3
    G1. Expanded Bankers Professional Liability .........................................................3
    G2. Insurance Services ...........................................................................................4
    G3. Broker/Dealer Services ....................................................................................4
  H. TRUST ERRORS AND OMISSIONS .......................................................................4
II. ADDITIONAL BENEFITS
  A. SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES ...........5
  B. NOT-FOR-PROFIT DIRECTORSHIPS .....................................................................5
  C. EXTENDED REPORTING PERIOD ..........................................................................5
  D. INVESTIGATIVE COSTS COVERAGE .....................................................................5
III. DEFINITIONS ..................................................................................................................7
IV. EXCLUSIONS ................................................................................................................13
V. GENERAL AGREEMENTS AND CONDITIONS .............................................................19
  A. LIMIT OF LIABILITY ...............................................................................................19
  B. RETENTION AND INDEMNIFICATION ..................................................................19
  C. SINGLE CLAIM ......................................................................................................19
  D. ORDER OF PAYMENTS .........................................................................................19
  E. DEFENSE AND SETTLEMENT ..............................................................................20
  F. ADVANCEMENT OF DEFENSE COSTS ................................................................20
  G. NOTICE OF CLAIMS AND POTENTIAL CLAIMS ..................................................20
  H. NEW SUBSIDIARIES AND CHANGES IN BUSINESS ACTIVITIES .......................21
  I. CANCELLATION AND NONRENEWAL ...................................................................22
  J. CONVERSION ........................................................................................................22
  K. ALLOCATION .........................................................................................................23
  L. REPRESENTATIONS .............................................................................................23
  M. SEVERABILITY ......................................................................................................23
  N. SEVERABILITY OF EXCLUSIONS .........................................................................24
  O. SUBROGATION .....................................................................................................24
  P. ASSIGNMENT AND ACCEPTANCE .......................................................................24
  Q. CONFORMITY TO STATUTE .................................................................................24
  R. AUTHORIZATION ...................................................................................................24
  S. CHANGES ..............................................................................................................24
  T. ACTION AGAINST THE INSURER .........................................................................24
  U. OTHER INSURANCE OR INDEMNIFICATION ......................................................24
  V. LOSS INFORMATION ............................................................................................24
  W. INSOLVENCY/BANKRUPTCY ...............................................................................25
  X. HEADINGS AND SUB-HEADINGS ........................................................................25

**Professional @vantage**
**for Financial Institutions**

It is understood and agreed that coverage will not be provided under any Insuring Agreement unless a Limit of Liability and retention for such Insuring Agreement are set forth in Item 8. of the Declarations.

**A.  INSURED PERSONS LIABILITY**

The Insurer will pay on behalf of the **Insured Persons**, **Loss** for which the **Insured Persons** are not indemnified by the **Financial Institution** and for which the **Insured Persons** are legally obligated to pay by reason of **Claims** first made during the **Policy Period** or the **Extended Reporting Period**, if elected, against the **Insured Persons** for **Wrongful Acts**.

**B.  FINANCIAL INSTITUTION INDEMNIFICATION**

The Insurer will pay on behalf of the **Financial Institution**, **Loss** for which the **Financial Institution** grants indemnification to the **Insured Persons** and for which the **Insured Persons** are legally obligated to pay by reason of **Claims** first made during the **Policy Period** or the **Extended Reporting Period**, if elected, against the **Insured Persons** for **Wrongful Acts**.

**C.  FINANCIAL INSTITUTION LIABILITY**

The Insurer will pay on behalf of the **Financial Institution**, **Loss** for which the **Financial Institution** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or the **Extended Reporting Period**, if elected, against the **Financial Institution** for **Wrongful Acts** not described in any other Insuring Agreement of this **Policy**.

**C1. IRA/Keogh Liability**

If C1. IRA/Keogh Liability is checked "included" under Item 8.a. of the Declarations, the Insurer will pay on behalf of the **Financial Institution**, **Loss** for which the **Financial Institution** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or the **Extended Reporting Period**, if elected, against the **Financial Institution** for **Wrongful Acts** while acting solely in the capacity as administrator, custodian, or trustee under any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan).

**C2. Depositor Liability**

If C2. Depositor Liability is checked "included" under Item 8.a. of the Declarations, the Insurer will pay on behalf of the **Financial Institution**, **Loss** for which the **Financial Institution** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or **Extended Reporting Period**, if elected, against the **Financial Institution** for **Wrongful Acts** relating to establishing, maintaining, administering or servicing any FDIC-insured deposit account or processing any transaction relating thereto.

**C3. Loss of Sensitive Customer Information**

If C3. Loss of Sensitive Customer Information is checked "included" under Item 8a. of the Declarations, the Insurer will pay on behalf of the **Financial Institution**, **Loss** for which the **Financial Institution** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or **Extended Reporting Period**, if elected, brought by a customer of the **Financial Institution** against the **Financial Institution** for **Wrongful Acts** relating to the failure to protect **Sensitive Customer Information**.

**D.  EMPLOYMENT PRACTICES LIABILITY**

The Insurer will pay on behalf of the **Insureds**, **Loss** for which the **Insured** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or **Extended Reporting Period**, if elected, against the **Insured** for **Wrongful Employment Acts**; provided such **Claims** are by or on behalf of a past, present or prospective **Employee** or a governmental body. For the purpose of the coverage afforded by this Insuring Agreement, the terms **Interrelated Wrongful Acts** and **Wrongful Act** wherever used throughout this **Policy** are deleted and replaced with **Interrelated Wrongful Employment Acts** and **Wrongful Employment Act**, respectively.

**D1. Third Party Sexual Harassment**

If D1. Third Party Sexual Harassment is checked "included" under Item 8.a. of the Declarations, the Insurer will pay on behalf of the **Insureds**, **Loss** for which the **Insured** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or **Extended Reporting Period**, if elected, against the **Insured** for **Wrongful Third Party Harassment Acts**; provided such **Claims** are by or on behalf of a governmental body or any natural person other than an **Insured Person**. For the purpose of the coverage afforded by this Insuring Agreement, the terms **Interrelated Wrongful Acts** and **Wrongful Act** wherever used throughout this **Policy** are deleted and replaced with **Interrelated Wrongful Third Party Harassment Acts** and **Wrongful Third Party Harassment Act**, respectively.

**Professional @vantage**
for Financial Institutions

Management and Professional Liability Policy                                          I. Insuring Agreements

E.  **FIDUCIARY LIABILITY**

The Insurer will pay on behalf of the **Insureds**, **Loss** for which the **Insured** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or the Extended Reporting Period, if elected, against the **Insureds** for **Wrongful Fiduciary Acts**. For the purpose of the coverage afforded by this Insuring Agreement, the terms **Interrelated Wrongful Acts** and **Wrongful Act** wherever used throughout this Policy are deleted and replaced with **Interrelated Wrongful Fiduciary Acts** and **Wrongful Fiduciary Act**, respectively.

E1.  Voluntary Correction Program

The Insurer will pay on behalf of the **Insureds**, **Voluntary Correction Fees** and **Defense Costs** with respect to a **Voluntary Correction Program Notice** first given to the Insurer during the **Policy Period**, or the Extended Reporting Period, if elected, provided:

1.  the **Voluntary Correction Fees** and **Defense Costs** are incurred after such **Voluntary Correction Program Notice** is first given to the Insurer; and

2.  the Insurer's maximum liability for all **Voluntary Correction Fees** and **Defense Costs** with respect to all **Voluntary Correction Program Notices** shall be $100,000, which is a part of, and not in addition to, the Fiduciary Liability Limit of Liability set forth in Item 8.b. of the Declarations.

F.  **LENDER LIABILITY**

The Insurer will pay on behalf of the **Insureds**, **loss** for which the **Financial Institution** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or Extended Reporting Period, if elected, by a Borrower or a Guarantor against the **Insureds** for **Wrongful Acts** relating to:

1.  an extension of credit;

2.  an agreement or refusal to extend credit;

3.  **Loan Servicing**, but only for any loan, lease, or extension of credit in which the **Financial Institution** has an ownership interest;

4.  the collection or restructuring of any extension of credit by the **Financial Institution**; or

5.  the rendering or failing to render **Incidental Insurance Services**.

F1.  Expanded Lender Liability

If F1. Expanded Lender Liability is checked 'included' under Item 8.a. of the Declarations, Insuring Agreement F. Lender Liability is deleted and replaced by the following:

The Insurer will pay on behalf of the **Insureds**, **Loss** for which the **Insureds** are legally obligated to pay by reason of **Claims** first made during the **Policy Period** or Extended Reporting Period, if elected, against the **Insureds** for **Wrongful Acts** relating to an extension of credit, an agreement or refusal to extend credit, **Loan Servicing**, the collection or restructuring of any extension of credit by the **Financial Institution**, or the rendering or failing to render **Incidental Insurance Services**.

G.  **BANKERS PROFESSIONAL LIABILITY**

The Insurer will pay on behalf of the **Insureds**, **Loss** for which the **Insured** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or Extended Reporting Period, if elected, brought by or on behalf of a customer of the **Financial Institution**, against the **Insured** for **Wrongful Professional Services Acts**. For the purpose of the coverage afforded by this Insuring Agreement, the terms **Interrelated Wrongful Acts** and **Wrongful Act** wherever used throughout this Policy are deleted and replaced with **Interrelated Wrongful Professional Services Acts** and **Wrongful Professional Services Act**, respectively.

G1.  Expanded Bankers Professional Liability

If G1. Expanded Bankers Professional Liability is checked 'included' under Item 8.a. of the Declarations, Insuring Agreement G. Bankers Professional Liability is deleted and replaced by the following:

The Insurer will pay on behalf of the **Insureds**, **Loss** for which the **Insured** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or Extended Reporting Period, if elected, against the **Insured** for **Wrongful Professional Services Acts**. For the purpose of the coverage afforded by this Insuring Agreement, the terms **Interrelated Wrongful Acts** and **Wrongful Act** wherever used throughout this Policy are deleted and replaced with **Interrelated Wrongful Professional Services Acts** and **Wrongful Professional Services Act**, respectively.

# Professional @vantage
## for Financial Institutions

**Management and Professional Liability Policy**                    **I. Insuring Agreements**

G2. **Insurance Services**

If G2. Insurance Services is checked "included" under Item 8.a. of the Declarations, the Insurer will pay on behalf of the Insureds, **Loss** for which the **Insured** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or Extended Reporting Period, if elected, against the **Insured** for **Wrongful Acts** in rendering or failing to render **Insurance Services**.

G3. **Broker/Dealer Services**

If G3. Broker/Dealer Services Coverage is checked "included" under Item 8.a. of the Declarations, the Insurer will pay on behalf of the **Insureds, Loss** for which the **Insured** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or Extended Reporting Period, if elected, against the **Insured** for **Wrongful Acts** in rendering or failing to render **Broker/Dealer Services**.

H. **TRUST ERRORS AND OMISSIONS**

The Insurer will pay on behalf of the **Insured, Loss** for which the **Insured** is legally obligated to pay by reason of **Claims** first made during the **Policy Period** or the Extended Reporting Period, if elected, against the **Insured** for **Wrongful Acts** in rendering or failing to render **Trust Department Services**.

**Professional @vantage**
for Financial Institutions

Management and Professional Liability Policy                                    II. Additional Benefits

A. **SPOUSES, DOMESTIC PARTNERS, ESTATES AND LEGAL REPRESENTATIVES**

1. This Policy shall cover Loss resulting from Claims for Wrongful Acts of an Insured Person made against:

   (A) the estates, heirs, legal representatives or assigns of any Insured Persons who are deceased, incompetent, insolvent or bankrupt; provided that such Claims would have been covered by this Policy in the absence of such death, incompetence, insolvency or bankruptcy; and

   (B) the lawful spouse or Domestic Partner of an Insured Person solely by reason of such person's status as a spouse or Domestic Partner, or such spouse or Domestic Partner's ownership interest in property which the claimant seeks as recovery for an alleged Wrongful Act of such Insured Person.

2. The coverage provided by this Subsection shall not apply with respect to any Loss arising from any act or omission by an Insured Person's estate, heirs, legal representatives, assigns, spouse or Domestic Partner.

B. **NOT-FOR-PROFIT DIRECTORSHIPS**

Coverage otherwise afforded under Insuring Agreements A. Insured Persons Liability and B. Financial Institution Indemnification is extended to also apply to Loss resulting from Claims for Wrongful Acts by Insured Persons while serving on the board of directors, board of trustees, or as officers of any not-for-profit entity at the direction of the Financial Institution; provided, however, that this coverage shall be excess over any other insurance or indemnification available to the Insured Persons, including without limitation any insurance or indemnification available from or provided by such not-for-profit entity.

C. **EXTENDED REPORTING PERIOD**

1. If this Policy converts subject to Section V.J.1.(B) or (C) or if the Named Insured cancels this Policy or if the Named Insured or the Insurer refuse to renew this Policy, the Insureds shall have the right to purchase an optional extended reporting period (herein called the Extended Reporting Period) for the period set forth in Item 5.a. of the Declarations.

2. Subject to the other terms, conditions and limitations of this Policy, coverage during the Extended Reporting Period shall only apply with respect to Claims first made during the Extended Reporting Period resulting from Wrongful Acts that occurred prior to the effective date

of such conversion, cancellation or non-renewal. Notice of facts and circumstances that may give rise to a Claim, pursuant to Section V.G.2., must be given during the Policy Period and shall not be effective if given during the Extended Reporting Period.

3. If this Policy converts subject to Section V.J.1.(B) or (C) and the Insureds elect to purchase the Extended Reporting Period, the premium due shall equal that percent set forth in Item 5.b. of the Declarations of the annualized premium for this Policy for the last Policy Year prior to such conversion, including the fully annualized amount of any additional premiums charged by the Insurer for or during such Policy Year.

4. The Extended Reporting Period is noncancellable and the entire premium shall be deemed fully earned at its commencement.

5. The Insureds' right to purchase the Extended Reporting Period shall lapse unless the Insurer receives written notice of the Insureds' election and full payment of any additional premium due within sixty (60) days after the effective date of such conversion, cancellation or non-renewal.

6. The offer by the Insurer to renew this Policy under terms, conditions, Limits of Liability, retentions, or premiums different from those applicable to the expiring Policy shall not constitute a refusal to renew and shall not entitle any Insured to elect the Extended Reporting Period.

D. **INVESTIGATIVE COSTS COVERAGE**

If Financial Institution Liability coverage under Insuring Agreement C. Financial Institution Liability is granted as set forth in Item 8. of the Declarations, the Insurer shall pay up to $100,000 on behalf of the Financial Institution for reasonable costs, charges, fees (including attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, trustees, members of the board of managers, management committee members, officers or employees of the Financial Institution) incurred by the Financial Institution, including its board of directors, board of managers, or any committee thereof, in connection with the Financial Institution's investigation or evaluation of any written demand first made upon the board of directors or board of managers of such Financial Institution during the Policy Period or Extended Reporting Period, if elected, by one or more security holders of the Financial Institution, without the solicitation, assistance or active participation of any director or officer of a Financial Institution, to bring a civil proceeding in a court of law

**Professional @vantage**
**for Financial Institutions**

on behalf of the **Financial Institution** against any
**Insured Person** for a covered **Wrongful Act.** This
extension of coverage shall be part of, and not in
addition to the Insuring Agreement C. Financial In-
stitution Liability Limit of Liability set forth in Item 8.a.
of the Declarations, and no retention shall apply to
this extension of coverage.

**Professional @vantage**
for Financial Institutions

1. **Administration** means counseling **Employees**, participants or beneficiaries with respect to, interpreting, handling records in connection with, or effecting enrollment or cancellation of **Employees**, participants or beneficiaries under any **Benefit Plan**.

2. **Application** means all applications, attachments, and materials submitted to the Insurer for this **Policy** or any policy of which this **Policy** is a direct or indirect renewal or replacement. All such applications, attachments and materials are deemed attached to and incorporated into this **Policy**, as if physically attached.

3. **Benefit Plan** means:

   (A) any Employee Benefit Plan, Pension Benefit Plan or Welfare Benefit Plan, as each is defined in ERISA, which is operated solely by the **Financial Institution** or jointly by the **Financial Institution** and a labor organization solely for the benefit of the **Employees** of the **Financial Institution**;

   (B) any other employee benefit plan or program not subject to ERISA which is sponsored solely by the **Financial Institution** for the benefit of its **Employees**, including any fringe benefit or excess benefit plan;

   (C) any other plan or program otherwise described in paragraphs (A) or (B) above while such plan or program is being actively developed, formed or proposed by the **Financial Institution** prior to the formal creation of such plan or program; provided, however, no coverage is afforded under this **Policy** for any **Claim** against an **Insured** in a settlor or similar uninsured capacity with respect to any plan or program;

   (D) any government-mandated insurance program for workers compensation, unemployment, social security or disability benefits for **Employees**; and

   (E) any other plan, fund, or program specifically included as a **Benefit Plan** by written endorsement to this **Policy**.

   **Benefit Plan** shall not include any multiemployer plan created before or during the **Policy Period**, unless such plan is specifically included as a **Benefit Plan** by written endorsement to this **Policy**.

4. **Broker/Dealer Services** means the purchase or sale of securities, mutual funds, annuities, variable annuities, or life, accident or health insurance which have been approved by the Financial Institution to be transacted through a **Registered Representative** of the **Financial Institution** or a third party service provider pursuant to a contract between the **Financial Institution** and the service provider. In connection with the forgoing activities, **Broker/Dealer Services** also includes the provision of:

   (A) economic advice, financial advice or investment advisory services; and

   (B) financial planning advice including without limitation any of the following activities in conjunction therewith: the preparation of financial plans or personal financial statements, and the giving of advice with regard to insurance, savings, investments, retirement planning or taxes.

   **Broker/Dealer Services** shall not include **Insurance Services** or **Incidental Insurance Services**.

5. **Claim**, either in the singular or plural, means any of the following instituted against an **Insured**:

   (A) a written or oral demand for monetary damages or non-monetary relief;

   (B) a civil proceeding commenced by the service of a complaint or similar pleading;

   (C) a criminal proceeding commenced by a return of an indictment;

   (D) an arbitration or mediation proceeding in which monetary damages are sought;

   (E) a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document;

   (F) solely with respect to Insuring Agreement E1. Voluntary Correction Program, a **Voluntary Correction Notice**; or

   (G) a written request to toll or waive a period of limitations, relating to a potential **Claim** described in subparagraphs (A) through (E) above;

   for a **Wrongful Act**.

   **Claim** shall not include a labor or grievance proceeding which is pursuant to a collective bargaining agreement.

6. **COBRA** means the Consolidated Omnibus Budget Reconciliation Act, as amended.

7. **Defense Costs** means reasonable and necessary fees and expenses incurred in defending or investigating any **Claim** and the premium for appeal, attachment or similar bonds. **Defense Costs** shall not include salaries, wages, overhead, or benefit expenses incurred by any **Insured**.

**Professional @vantage**
**for Financial Institutions**

8. **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Financial Institution**.

9. **Employee**, either in the singular or plural, means:

    (A) any natural person who is a past, present or future employee of the **Financial Institution** including any part-time, seasonal or temporary employee, acting in their capacity as such;

    (B) any **Leased Employee**, provided that:

        (i) any coverage under this **Policy** for such **Leased Employee** only applies to the extent that the **Financial Institution** agrees to indemnify such **Leased Employee**; and

        (ii) Such coverage shall be specifically excess of any other indemnity and insurance otherwise available to such **Leased Employee** or any entity for which such **Leased Employee** is affiliated; or

    (C) solely with respect to Insuring Agreements D. Employment Practices Liability and D1. Third Party Sexual Harassment, any **Independent Contractor**, provided that:

        (i) any coverage under this **Policy** for such **Independent Contractor** only applies to the extent that the **Financial Institution** agrees to indemnify such **Independent Contractor**; and

        (ii) any such coverage shall be specifically excess of any other indemnity and insurance otherwise available to such **Independent Contractor** or any entity for which such **Independent Contractor** is affiliated.

10. **ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

11. **Financial Impairment** means the status of the **Financial Institution** resulting from:

    (A) the appointment by any state or federal official, regulatory agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage, or liquidate the **Financial Institution**; or

    (B) the **Financial Institution** becoming a debtor in possession.

12. **Financial Institution** means the entity or entities set forth in Item 1. of the Declarations, any **Subsidiary** created or acquired as of the inception date set forth in Item 2. of the Declarations, and, subject to Section V.H. of the **Policy**, any **Subsidiary** created or acquired during the **Policy Period**.

13. **Fungi** includes but is not limited to any fungus or mycota or any by-product or type of infestation produced by such fungus or mycota, including but not limited to mold, mildew, mycotoxins, spores or any biogenic aerosols.

14. **Incidental Insurance Services** means the sale of credit life or disability insurance incidental to the issuance of a loan.

15. **Independent Contractor** means a natural person, other than a director, officer, employee, or **Leased Employee** of the **Financial Institution**, who renders service to the **Financial Institution** as an independent contractor pursuant to a contract for specified services.

16. **Insurance Services** means any of the following services, other than **Incidental Insurance Services**, performed by an **Insured** as insurance agent, insurance broker, insurance consultant or insurance managing general agent:

    (A) sale and placement of insurance;

    (B) identification, analysis and evaluation of a client's insurance needs, including work performed for prospective clients;

    (C) appraisal of property and inspections for insurance purposes;

    (D) adjustment of claims on behalf of insurance companies, including loss payments; or

    (E) arrangement of premium financing for clients.

    **Insurance Services** does not include services as an insurance wholesaler, managing general underwriter, or third party administrator of benefit or insurance plans.

17. **Insured**, either in the singular or plural, means:

    (A) the **Insured Persons**;

    (B) the **Financial Institution**; and

    (C) solely with respect to Insuring Agreements E. Fiduciary Liability and E1. Voluntary Correction Program, any **Benefit Plan**.

**Professional @vantage**
**for Financial Institutions**

Management and Professional Liability Policy                    III. Definitions

18. <u>Insured Person</u>, either in singular or plural, means any past, present or future director, member of the board of trustees, officer, **Employee**, honorary or advisory director, or honorary or advisory member of the board of trustees of the **Financial Institution**. Solely with respect to coverage under Insuring Agreement E. Fiduciary Liability, **Insured Person** also means any past, present or future natural person trustee or natural person fiduciary of a **Benefit Plan**.

19. <u>Interrelated Wrongful Acts</u> means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

20. <u>Interrelated Wrongful Employment Acts</u> means **Wrongful Employment Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, ev nts or transactions.

21. <u>Interrelated Wrongful Fiduciary Acts</u> means **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

22. <u>Interrelated Wrongful Professional Services Acts</u> means **Wrongful Professional Services Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

23. <u>Interrelated Wrongful Third Party Harassment Acts</u> means **Wrongful Third Party Harassment Acts** which have as a common nexus any fact, circumstance, situation, event, transaction or series of related facts, circumstances, situations, events or transactions.

24. <u>Leased Employee</u> means a natural person, other than a director, officer, or employee of the **Financial Institution** or an **Independent Contractor**, who is leased to the **Financial Institution** to perform work for the **Financial Institution** and for whom the **Financial Institution** controls the mean and manner of the work performed.

25. <u>Loan Servicing</u> means the servicing of any loan, lease or extension of credit (not including financing for investment banking or leveraged or management buy-outs). **Loan Servicing** includes the following servicing activities: record keeping, billing and disbursements of principal

and interest, receipt or payment of insurance premiums and taxes, credit reporting or statements of a customer's creditworthiness, or the determination of the depreciation amount of property (but not projections of or an appraisal for residual or future value of property).

**Loan Servicing** does not include the purchase, extension of credit, any act of restructure, termination, transfer, and repossession or foreclosure of any loan, lease or extension of credit.

26. <u>Loss</u> means any amount which the **Insureds** are legally obligated to pay resulting from a **Claim**, including damages, judgments, settlements, **Defense Costs**, pre- and post-judgment interest, punitive or exemplary damages, the multiple portion of any multiplied damage award and liquidated damages under the Age Discrimination in Employment Act, where insurable by law. **Loss** shall not include:

(A) taxes, fines or penalties imposed by law, provided that this exception to the definition of **Loss** shall not apply under Insuring Agreement E. Fiduciary Liability to any **Voluntary Correction Fees** or to the 5% or less, or the 20% or less, civil penalties imposed upon an **Insured** under Section 502(i) or (l), respectively, of ERISA;

(B) any unpaid, unrecoverable or outstanding loan, lease or extension of credit to any customer or any forgiveness of debt;

(C) other than **Defense Costs**, that portion of **Loss** that constitutes costs to comply with any non-monetary or injunctive relief of any kind or any **agreement** to provide such relief, including but not limited to any damages, costs or expenses incurred in making an accommodation for any disabled person pursuant to the Americans with Disabilities Act or any similar federal, state or local laws, or in complying with any other federal, state or local laws of any kind;

(D) other than **Defense Costs**, that portion of **Loss** that the **Financial Institution** is obligated to pay pursuant to any express written or oral **contract** or **agreement** existing prior to the date the **Claim** is made; provided, however, if it is established in fact that such **Claim** involves an intentional breach of contract, the **Insured** agrees to reimburse the Insurer for such **Defense Costs**;

**Professional @vantage**
**for Financial Institutions**

(E) any restitution, disgorgement, return or repayment of any sums, including but not limited to the return of fees, commissions or charges for the **Financial Institution's** services; or

(F) any royalties or licensing fees, or

(G) any matters which are uninsurable under the law pursuant to which this **Policy** shall be construed.

27. **Loss Information** means information on open, closed and potential **Claims**, including date, description, and payment amounts, if any.

28. **Named Insured** means the first named entity set forth in Item 1. of the Declarations.

29. **Policy** means, collectively, the Declarations, the **Application**, this policy form and any Endorsements attached hereto.

30. **Policy Period** means the period from the inception date set forth in Item 2. of the Declarations to the expiration date set forth in Item 2. of the Declarations or any earlier termination date in accordance with Section V.I.

31. **Policy Year** means the period of one year following the inception date and hour set forth in Item 2. of the Declarations or any anniversary thereof, or if the time between the inception date and termination of the **Policy Period** is less than one year, such lesser period. Any extension of the **Policy Period** shall not result in an increase or reinstatement of the Limit of Liability. If the **Policy Period** is extended beyond its original expiration date, the period of the extension shall be a part of the **Policy Year** which would have ended on the original expiration date.

32. **Pollutants** means any solid, liquid, gaseous or thermal organism, irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, hazardous substances, nuclear materials and waste. Waste includes materials to be recycled, reconditioned or reclaimed. Pollutants also mean any other air emission, odor, waste, water, oil or oil products, asbestos or asbestos products, noise and electric or magnetic or electromagnetic field.

33. **Professional Services** means only those services performed or required to be performed by an **Insured** for or on behalf of a customer of the **Financial Institution:**

(A) for a fee, commission or other monetary compensation;

(B) where a fee, commission or other monetary compensation would usually be received by the **Insured** but for business or other reasons is waived by the **Insured**; or

(C) for other remuneration which inures to the benefit of the **Insured**.

**Professional Services** does not include: (i) medical or health care services; (ii) real estate appraisal services; (iii) architectural or construction management services; (iv) the practice of law or the rendering of legal services; (v) services provided to customers as an enrolled actuary as that term is used in or in connection with **ERISA**; (vi) rendering advice with regard to the FDIC-insured component of any deposit account; (vii) **Insurance Services, Broker/Dealer Services**, or **Trust Department Services**, or (viii) any services performed by or for any entity to which the **Insured** shall have acquired ownership or control as security for a loan, lease or other extension of credit.

34. **Registered Representative** means an individual who is:

(A) registered with the National Association of Securities Dealers; or

(B) a life insurance agent or insurance broker who is licensed by the appropriate regulatory authorities.

35. **Sensitive Customer Information** means any customer name, address, telephone number, social security number, driver's license number, account number, credit or debit card number, PIN, password, account history or any other private or personal customer information.

36. **Subsidiary** means:

(A) any entity in which the **Financial Institution** owns, directly or indirectly, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of directors;

(B) any limited liability company in which the **Financial Institution**, directly or indirectly, has the right to appoint or designate fifty percent (50%) or more of such limited liability company's managers; or

(C) any joint venture in which the **Financial Institution**, directly or indirectly, has the right to elect, appoint or designate more than fifty percent (50%) of such entity's directors, trustees or other equivalent executives.

**Professional @vantage**
for Financial Institutions

37. **Trust Department Services** means services performed or required to be performed for or on behalf of a customer by an **Insured** through a Trust Department or Trust **Subsidiary** of the **Financial Institution** in any of the following capacities:

(A) administrator, custodian or trustee under any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan);

(B) executor, administrator, or personal representative of estates, administrator of guardianships, trustee under personal or corporate trust agreements, or conservator of any person;

(C) trustee under a pension, profit sharing, health and welfare or any other employee benefit plan or trust, other than an employee benefit plan or trust sponsored or established by the **Financial Institution** for its own **Employees**;

(D) custodian, depository or managing agent for securities or real property, manager of any personal property owned by others, attorney-in-fact, interest or dividend disbursing agent, transfer or paying agent, redemption or subscriptions agent, fiscal agent, tax withholding agent, registrar of securities, agent for voting securities, sinking fund agent, escrow agent or trustee under a corporate bond indenture; or

(E) trustee exercising any other trust or fiduciary powers permitted by law.

38. **Voluntary Correction Fees** means any fees, fines, penalties or sanctions paid by an **Insured** to a governmental authority pursuant to a **Voluntary Correction Program** for the actual or alleged inadvertent non-compliance by a **Benefit Plan** with any statute, rule or regulation. **Voluntary Correction Fees** shall not include:

(A) any costs to correct the non-compliance, or any other charges, expenses, taxes, or damages; or

(B) any fees, fines, penalties or sanctions relating to a **Benefit Plan** which, as of the earlier of the inception of this **Policy** or the inception of the first policy in an uninterrupted series of policies issued by the Insurer of which this **Policy** is a direct or indirect renewal or replacement, any **Insured Person** knew to be actually or allegedly non-compliant.

39. **Voluntary Correction Program** means any voluntary compliance resolution program or similar voluntary settlement program administered by the U.S. Internal Revenue Service or the U.S. Department of Labor, including but not limited to, the Employee Plans Compliance Resolution System, the Audit Closing Agreement Program, the Voluntary Compliance Resolution Program, the Walk-In Closing Agreement Program, the Administrative Policy Regarding Self Correction, the Tax Sheltered Annuity Voluntary Correction Program, the Delinquent Filer Voluntary Compliance Program, the Voluntary Fiduciary Correction Program, or any other similar program administered by a governmental authority located outside the United States.

40. **Voluntary Correction Program Notice** means prior written notice to the Insurer by the **Insured** of the **Insured's** intent to enter into a **Voluntary Correction Program**.

41. **Wrongful Act**, either in the singular or plural, means any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by:

(A) any **Insured Person** in the discharge of their duties while acting in the capacity as such or while acting in the capacity as director, trustee or officer of a not-for-profit entity pursuant to Section II.B., or any other matter claimed against the **Insured Persons** solely by reason of serving in such capacities;

(B) any **Insured Person** in the discharge of their duties while acting in the capacity as administrator, custodian or trustee under any individual retirement account (IRA) or H.R. 10 Plan (Keogh Plan) outside of the scope of any Trust Department or Trust **Subsidiary** of the **Financial Institution**, if such service is at the direction of the **Financial Institution**; or

(C) the **Financial Institution** or any person or entity for which the **Financial Institution** is legally responsible, but only to the extent that coverage is granted to the **Financial Institution** by Insuring Agreements C. Financial Institution Liability, C1. IRA/Keogh Liability, C2. Depositor Liability, C3. Loss of Sensitive Customer Information, F. Lender Liability, F1. Expanded Lender Liability, G2. Insurance Services, G3. Broker/Dealer Services, or H. Trust Errors & Omissions of this **Policy**.

Form No. SCB 002, Ed. 01-06

**Professional @vantage**
**for Financial Institutions**

For purposes of Insuring Agreements A. Insured Persons Liability and B. Financial Institution Indemnification, **Wrongful Act** shall not include any **Wrongful Act** described in any other Insuring Agreement of this **Policy** except Insuring Agreements F. Lender Liability, F1. Expanded Lender Liability, G. Bankers Professional Liability, G1. Expanded Bankers Professional Liability, G2. Insurance Services, or G3. Broker/Dealer Services.

42. **Wrongful Employment Act**, either in the singular or plural, means any actual or alleged act, error, omission, misleading statement, neglect, or breach of duty by any **Insured** in their capacity as such that constitutes or causes:

    (A) unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when:

        (i) submission to such conduct is made either explicitly or implicitly a term and condition of an individual's employment;

        (ii) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual;

        (iii) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment;

    (B) workplace harassment of a non-sexual nature as a consequence of race, color, creed, national origin, sex, sexual orientation or preference, religion, age, gender, disability or handicap, pregnancy, or any other legally protected status, which has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment;

    (C) the termination of employment, the failure or refusal to hire or promote, the demotion of, or the employment-related defamation of any individual because of race, color, creed, national origin, sex, sexual orientation or preference, religion, age, gender, disability or handicap, pregnancy, or any other legally protected status;

    (D) termination of an employment relationship in a manner which is against the law or in breach of an implied agreement to continue employment, including constructive and retaliatory discharge;

    (E) employment-related misrepresentation or retaliation; employment-related libel, slander, humiliation, defamation, or invasion of privacy; wrongful failure to employ or promote; wrongful deprivation of career opportunity; wrongful demotion; negligent evaluation; negligent hiring; negligent retention; wrongful discipline; or

    (F) any other violation of any statutory or common law relating to employment other than those statutes or regulations set forth in Section IV.44.;

    but only if such conduct relates to a past, present or prospective **Employee**.

43. **Wrongful Fiduciary Act** means:

    (A) any breach of the responsibilities, obligations or duties imposed by **ERISA** upon **Insureds** who are fiduciaries of any **Benefit Plan** in their capacity as such fiduciaries;

    (B) any negligent act, error or omission in the **Administration** of any **Benefit Plan** committed, attempted, or allegedly committed or attempted by any **Insured** in their capacity as such; or

    (C) any other matter claimed against any **Insureds** solely by reason of their service as a fiduciary of any **Benefit Plan**.

44. **Wrongful Professional Services Act** means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured** in their capacity as such in the rendering or failure to render **Professional Services**.

45. **Wrongful Third Party Harassment Act** means any actual or alleged violation by any **Insured** in their capacity as such of any federal, state, provincial, or local statutory law, common law, or civil law anywhere in the world, prohibiting any kind of sexual harassment, such as unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature against any natural person other than an **Insured Person**, provided that **Wrongful Third Party Harassment Act** shall not include any **Wrongful Employment Act**.

**Professional @vantage**
for Financial Institutions

Management and Professional Liability Policy                                      IV. Exclusions

1. **Bankers Professional Liability** – The Insurer shall not be liable to make any payment for Loss in connection with any **Claim** arising out of or in any way involving a **Wrongful Professional Services Act**.

   This exclusion applies to all Insuring Agreements except A. Insured Persons Liability, B. Financial Institution Indemnification, G. Bankers Professional Liability, G1. Expanded Bankers Professional Liability, G2. Insurance Services, and G3. Broker/Dealer Services.

2. **Bodily Injury and Property Damage** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** for actual or alleged bodily injury, sickness, disease, or death of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof.

   This exclusion applies to all Insuring Agreements except G2. Insurance Services.

2. **Bonding or Insurance Company** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** brought or maintained directly or indirectly by or for the benefit of any bond carrier or insurance carrier of the **Financial Institution**, regardless in whose name such **Claim** is actually made.

   This exclusion applies to Insuring Agreements C. Financial Institution Liability, C1. IRA/Keogh Liability, C2. Depositor Liability, C3. Loss of Sensitive Customer Information, F. Lender Liability, F1. Expanded Lender Liability, G2. Insurance Services, and G3. Broker/Dealer Services.

4. **Broker/Dealer Services** – The Insurer shall not be liable to make any payment for Loss in connection with any **Claim** arising out of or in any way involving the rendering or failing to render **Broker/Dealer Services**.

   This exclusion applies to all Insuring Agreements except G3. Broker/Dealer Services.

5. **Claim Participation** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** by any security holder of the **Financial Institution**, whether directly or derivatively, unless such security holder bringing such **Claim** is acting independently of, and totally without the solicitation, assistance, participation, or intervention of, any past, present or future director, officer or equivalent executive of the **Financial Institution**.

   This exclusion applies to all Insuring Agreements.

6. **Commingling of Funds** – The Insurer shall not be liable to make any payment for Loss, other than **Defense Costs**, in connection with any **Claim** arising out of or in any way involving any actual or alleged commingling of funds or accounts.

   This exclusion only applies to Insuring Agreement G2. Insurance Services.

7. **Compensation Earned** – The Insurer shall not be liable to make any payment for **Loss**, other than **Defense Costs**, in connection with any **Claim** arising out of or in any way involving compensation earned by the claimant while employed by the **Financial Institution** but not paid by the **Financial Institution** for reasons other than **Wrongful Employment Acts**, or damages determined to be owing under an express written contract of employment or an express written obligation to make payments in the event of termination of employment.

   This exclusion applies only to Insuring Agreement D. Employment Practices Liability.

8. **Contract** – The Insurer shall not be liable to make any payment for Loss in connection with any **Claim** arising out of or in any way involving the assumption of any liability to defend, indemnify, or hold harmless any person or entity, other than an **Insured Person**, under any written contract or agreement; however, this exclusion shall not apply to:

   (A) liability which would be imposed regardless of the existence of such contract or agreement; or

   (B) solely with respect to Insuring Agreement E. Fiduciary Liability, liability which was assumed in accordance with or under the agreement or declaration of trust pursuant to which a **Benefit Plan** was established.

   This exclusion applies to all Insuring Agreements except A. Insured Persons Liability, B. Financial Institution Indemnification, and D. Employment Practices Liability.

9. **Custody and Control** – The Insurer shall not be liable to make any payment for Loss in connection with any **Claim** arising out of or in any way involving the actual loss of money, securities, property or other items of value in the custody or control of the **Financial Institution**, its correspondent bank or other authorized representative, or in transit while in the care, custody and control of an authorized representative of the **Financial Institution**.

   This exclusion only applies to Insuring Agreement G. Bankers Professional Liability, G1. Expanded Bankers Professional Liability, G2. Insurance Services and G3. Broker/Dealer Services.

**Professional @vantage**
**for Financial Institutions**

10. <u>Depreciation in Value</u> – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the depreciation (or failure to appreciate) in value of any investment product, including securities, commodities, currencies, options or futures; provided that:

 (A) only with respect to Insuring Agreement E. Fiduciary Liability, this exclusion shall not apply to any depreciation (or failure to appreciate) caused solely by a **Wrongful Fiduciary Act** in the **Administration** of a **Benefit Plan**; and

 (B) only with respect to Insuring Agreements A. Insured Persons Liability, B. Financial Institution Indemnification, G. Bankers Professional Liability, G1. Expanded Bankers Professional Liability, or G3. Broker/Dealer Services, or H. Trust Errors and Omissions, this exclusion shall not apply to any depreciation (or failure to appreciate) due solely to the negligence on the part of an **Insured** in failing to effect a specific investment transaction in accordance with the specific prior instructions of a customer of the **Financial Institution**.

 <u>This exclusion applies to all Insuring Agreements except D. Employment Practices Liability and D1. Third Party Sexual Harassment.</u>

11. <u>Employee Benefits</u> – The Insurer shall not be liable to make any payment for **Loss** which constitutes or is equivalent to employment-related benefits, retirement benefits, perquisites, vacation and sick days, medical and insurance benefits, deferred compensation or any other type of compensation other than salary, wages or bonus compensation.

 <u>This exclusion applies only to Insuring Agreement D. Employment Practices Liability.</u>

12. <u>Employment Practices</u> – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any **Wrongful Employment Act** or **Wrongful Third Party Harassment Act**.

 <u>This exclusion applies to all Insuring Agreements except D. Employment Practices Liability and D1. Third Party Sexual Harassment.</u>

13. <u>ERISA</u> – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** for any violation of **ERISA** or similar provisions of any federal, state or local statutory law, common law or administrative law with respect to any **Benefit Plan** or other pension, profit sharing or employee benefit program established in whole or in part for the benefit of **Employees** of the **Financial Institution**.

 <u>This exclusion applies to all Insuring Agreements except E. Fiduciary Liability, and E1. Voluntary Correction Program.</u>

14. <u>Failure to Collect Contribution or Benefits</u> – The Insurer shall not be liable to make any payment for **Loss**, other than **Defense Costs**, in connection with any **Claim** for:

 (A) the failure to collect contributions owed to a **Benefit Plan** or other employee benefit program unless such failure is due to the negligence of the **Insured**;

 (B) the return or reversion to an employer of any contribution to or asset of a **Benefit Plan**; or

 (C) benefits paid or payable to a participant or beneficiary of any **Benefit Plan** or other employee program or benefits which would be payable to such a participant or beneficiary if the **Benefit Plan** or other employee program or benefits complied with applicable law. This paragraph (C) shall not apply to the extent that the benefits are payable by an **Insured Person** as a personal obligation and recovery of the benefits is based upon a covered **Wrongful Fiduciary Act**.

 <u>This exclusion only applies to Insuring Agreements E. Fiduciary Liability, E1. Voluntary Correction Program and G2. Insurance Services.</u>

15. <u>Fee Dispute</u> – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving disputes over fees, commissions, or charges for the **Financial Institution's** services.

 <u>This exclusion applies to all Insuring Agreements except A. Insured Persons Liability, B. Financial Institution Indemnification, D. Employment Practices Liability, and H. Trust Errors & Omissions.</u>

**Professional @vantage**
**for Financial Institutions**

Management and Professional Liability Policy                    IV. Exclusions

16. <u>Financial Impairment</u> – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the **Financial Impairment** of the **Financial Institution**, includin any **Subsidiary**.

    This exclusion only applies to Insuring Agreements C2. Depositor Liability, F. Lender Liability and F1. Expanded Lender Liability.

17. <u>Foreclosed Property</u> – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the ownership, operation, management or control of any entity or property acquired by the **Financial Institution** as security or collateral for any loan, lease or extension of credit. This exclusion shall not apply to **Claims** resulting from **Wrongful Acts** in connection with the foreclosure process or the ownership, operation, management or control of any one to four family residential property.

    This exclusion applies to all Insuring Agreements except A. Insured Persons Liability, B. Financial Institution Indemnification, D. Employment Practices Liability, and E. Fiduciary Liability.

18. <u>Fraud or Violation of Law</u> – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** against any **Insured** arising out of or in any way involving any deliberately fraudulent, dishonest or criminal act or any willful violation of any civil or criminal statute, regulation or law by such **Insured**, provided a final judgment or adjudication establishes such fraudulent, dishonest, or criminal act or such willful violation of statute, regulation or law.

    This exclusion applies to all Insuring Agreements except D. Employment Practices Liability, D1. Third Party Sexual Harassment and E. Fiduciary Liability.

19. <u>Front Pay</u> - The Insurer shall not be liable to make any payment for **Loss** which constitutes front pay, future damages or other future economic relief or the equivalent thereof which compensates the claimant for damages beyond the date of settlement or adjudication, where the **Financial Institution** has the option pursuant to a settlement or adjudication to reinstate the claimant, but fails to reinstate the claimant.

    This exclusion applies only to Insuring Agreement D. Employment Practices Liability.

20. <u>Illegal Profit or Payment Exclusion</u> - The Insurer shall not be liable to make any payment for **Loss**, other than **Defense Costs**, in connection with any **Claim** against an **Insured** arising out of or in any way involving:

    (A) such **Insured** in fact gaining any profit, remuneration, or financial advantage to which such **Insured** was not legally entitled; or

    (B) the **Financial Institution** paying inadequate or excessive consideration in connection with its purchase of **Financial Institution** securities.

    This exclusion applies to all Insuring Agreements except D. Employment Practices Liability.

21. <u>Insurance Services Exclusion</u> - The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the rendering or failing to render **Insurance Services** (other than Incidental Insurance Services).

    This exclusion applies to all Insuring Agreements except G2. Insurance Services and D. Employment Practices Liability.

22. <u>Insured vs. Insured</u> – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** by, on behalf of, or at the behest of any **Insured** in any capacity except where such **Claim** is brought and maintained:

    (A) in the form of a cross-claim or third party claim for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded by the terms of the **Policy**;

    (B) by an **Insured Person** solely as a customer of the **Financial Institution**; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any other **Insured**; or

    (C) by a security holder of the **Financial Institution** as a derivative action on behalf of the **Financial Institution**; provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation, or intervention of any **Insured**.

    This exclusion applies to all Insuring Agreements except D. Employment Practices Liability and E. Fiduciary Liability.

23. <u>Intellectual Property</u> – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any actual or alleged infringement

**Professional @vantage**
**for Financial Institutions**

or violation of any intellectual property rights or laws, including copyright, title, slogan, patent, service mark, service name, trade dress, trade name, trade secret, or trademark.

The exclusion applies to all Insuring Agreements except A. Insured Persons Liability, B. Financial Institution Indemnification, D. Employment Practices Liability and E. Fiduciary Liability.

24. **Internet Services** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

    (A) access to or transmission of data via the Internet or private computer network owned, operated or controlled by the **Financial Institution**; or

    (B) website development, software development or network security services to third parties; or hosting services or services as an internet service provider, internet access provider, application service provider or provider of like services.

    This exclusion applies to all Insuring Agreements except A. Insured Persons Liability, B. Financial Institution Indemnification, D. Employment Practices Liability and E. Fiduciary Liability.

25. **Investment Banking and Securities Underwriting** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

    (A) underwriting, syndicating or promoting any security (except loan syndications or equity or debt securities issued by the **Financial Institution**);

    (B) rendering of advice or recommendations regarding any actual or attempted or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, bankruptcy, reorganization, restructuring, recapitalization, spin-off, offering of securities, dissolution or sale of all or substantially all of the assets or stock of an entity;

    (C) rendering of any fairness opinion;

    (D) proprietary trading;

    (E) any acquisition or sale of securities of the **Financial Institution** for its o n account; or

    (F) any other investment banking activity;

    including any disclosure requirements in connection with any of the foregoing activities.

    This exclusion applies only to Insuring Agreements C. Financial Institution Liability, F. Lender

Liability, F1. Expanded Lender Liability, G. Bankers Professional Liability, G1. Expanded Bankers Professional Liability, G2. Insurance Services, G3. Broker/Dealer Services, or H. Trust Errors and Omissions.

26. **Investment Performance** – The Insurer shall not be liable to make any payment for **Loss**, other than **Defense Costs**, in connection with any **Claim** arising out of or in any way involving oral or written representations, promises or guarantees regarding the past performance or future value of any investment product.

    This exclusion only applies to Insuring Agreement G3. Broker/Dealer Services.

27. **Legal Lending Limit** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any extension of credit which was, at the time of its making, in excess of 105% of the applicable legal lending limit of the **Financial Institution**.

    This exclusion applies only to Insuring Agreements C. Financial Institution Liability, F. Lender Liability, F1. Expanded Lender Liability, G. Bankers Professional Liability and G1. Expanded Bankers Professional Liability.

28. **Lender Liability and Loan Servicing** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving **Loan Servicing** or any extension of credit, any agreement or refusal to extend credit, or the collection, or restructuring of any extension of credit.

    This exclusion only applies to Insuring Agreements C. Financial Institution Liability, G. Bankers Professional Liability, and G1. Expanded Bankers Professional Liability.

29. **Loss Control and Safety Engineering** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving warranties or representations made in connection with safety inspections, loss control or safety engineering services.

    This exclusion only applies to Insuring Agreement G2. Insurance Services.

30. **Mechanical Malfunction** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the mechanical or electronic failure, breakdown or malfunction of any machine or system of machines.

Form No. SCB 002, Ed. 01-06

**Professional @vantage**
**for Financial Institutions**

Management and Professional Liability Policy                                       IV. Exclusions

This exclusion only applies to Insuring Agreements. G. Bankers Professional Liability, G1. Expanded Bankers Professional Liability, and G3. Broker/Dealer Services.

31. **Notary Services** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the notarization or certification of a signature of a person unless that person or someone claiming to be that person physically appeared before the **Insured** at the time of notarization or certification.

This exclusion only applies to Insuring Agreements C. Financial Institution Liability, G. Bankers Professional Liability, G1. Expanded Bankers Professional Liability, G2. Insurance Services, and G3. Broker/Dealer Services.

32. **Outside Directorship Liability** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any **Wrongful Act by the Insured Persons** in their capacities, or solely by reason of their status, as directors, officers, trustees, or employees of any entity other than the **Financial Institution**, even if directed or requested by the **Financial Institution** to serve as directors, officers, trustees, or employees of such other entity; provided this exclusion shall not apply with respect to coverage granted pursuant to Section II.B. of this **Policy**.

This exclusion applies to all Insuring Agreements.

33. **Personal Injury** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** for actual or alleged wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, abuse of process, assault, battery, mental anguish, emotional distress, loss of consortium, invasion of privacy, defamation, false light, libel, or slander.

This exclusion applies to all Insuring Agreements except C3. Loss of Sensitive Customer Information, D. Employment Practices Liability, D1. Third Party Sexual Harassment, F. Lender Liability, and F1. Expanded Lender Liability.

34. **Pollution** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

(A) the actual, alleged or threatened proliferation, discharge, disposal, migration, dispersal, release or escape of **Pollutants** or **Fungi**; or

(B) any direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize **Pollutants** or **Fungi**, or to pay for or contribute to the costs of undertaking such actions, including **Claims** alleging damage to the **Financial Institution** or its security holders.

This exclusion applies to all Insuring Agreements except D. Employment Practices Liability.

35. **Prior and Pending Litigation** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any litigation against any **Insured** initiated prior to the respective date set forth in Item 8.d. of the Declarations, or arising out of or in any way involving the same or substantially the same fact, circumstance or situation underlying or alleged in such prior litigation, provided this exclusion shall not apply to any **Claim** under Insuring Agreement D. Employment Practices Liability arising out of or in any way involving circumstances or situations underlying or alleged in any such prior or pending administrative proceeding before the Equal Employment Opportunity Commission or any similar federal, state, provincial or local government body if such administrative proceeding was brought by and on behalf of **Employees** who did not bring the **Claim**.

This exclusion applies to all Insuring Agreements.

36. **Prior Notice** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving any **Wrongful Act**, any **Interrelated Wrongful Acts**, or any fact, circumstance or situation, which has been the subject of any notice given prior to inception of this **Policy** to any carrier other than the Insurer under any other insurance policy providin protection for any **Insured**.

This exclusion applies to all Insuring Agreements.

37. **Receivership** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the **Financial Institution's** function or activity as receiver, trustee in bankruptcy, or assignee for the benefit of creditors.

This exclusion applies to all Insuring Agreements except A. Insured Persons Liability, B. Financial Institution Indemnification, D. Employment Practices Liability, E. Fiduciary Liability, G2. Insurance Services, and H. Trust Errors & Omissions.

Form No. SCB 002, Ed. 01-06

**Professional @vantage**
**for Financial Institutions**

38. **Safe Deposit Operations** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the safe deposit box operations of the **Financial Institution**.

    This exclusion only applies to Insuring Agreement C. Financial Institution Liability, G. Bankers Professional Liability, and G1. Expanded Bankers Professional Liability.

39. **Securities Claims Under Bankers Professional Liability** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** by or on behalf of any person, entity or concern (including but not limited to any shareholder, bondholder, or debenture holder), or their estate, heirs, legal representatives or assigns, with a legal or equitable interest in any stock, bond debenture or other form of security or ownership in the **Financial Institution**, when such **Claim** is based upon, arises out of or pertains to any interest in such security or ownership interest. This exclusion shall not apply to any **Claim** brought by such person solely in the capacity as a customer of the **Financial Institution** provided such **Claim** is brought independently of, and totally without the solicitation, assistance, participation or intervention of any other **Insured**.

    This exclusion only applies to Insuring Agreements G. Bankers Professional Liability and G1. Expanded Bankers Professional Liability.

40. **Subsidiary Wrongful Acts** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** against any **Subsidiary** or its **Insured Persons** a ting in the capacity of director, member of the board of trustees, officer or **Employee** of such **Subs diary** for any **Wrongful Act** or **Interrelated Wrongful Acts** actually or allegedly committed in whole or in part at any time when the entity was not a **Subsidiary**.

    This exclusion applies to all Insuring Agreements.

41. **Taxes and Premiums** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving disputes over taxes or the failure to collect, pay or return premiums.

    This exclusion only applies to Insuring Agreement G2. Insurance Services.

42. **Third Party Insolvency** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the:

    (A) insolvency, receivership, liquidation or bankruptcy of any insurance company the **Insured** represents; or

    (B) bankruptcy of or suspension of payments by any bank, banking firm, broker or dealer in securities or commodities or any other financial institution;

    provided that this exclusion shall not apply to the extent such **Claim** alleges a covered **Wrongful Act** in connection with an **Insured's** investment on behalf of a customer in the stock of any of the entities enumerated in paragraphs (A) and (B) above.

    This exclusion only applies to Insuring Agreements G. Bankers Professional Liability, G1. Expanded Bankers Professional Liability, G2. Insurance Services, G3. Broker Dealer Services, and H. Trust Errors and Omissions.

43. **Trust Department Services** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving the rendering or failing to render **Trust Department Services**.

    This exclusion applies to all Insuring Agreements except D. Employment Practices Liability and H. Trust Errors & Omissions.

44. **Violation of Employment Law** – The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** for an actual or alleged violation of the responsibilities, obligations, duties or prohibitions imposed by any Worker's Compensation, Unemployment Insurance, or disability benefits law, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Occupational Safety and Health Act, or any rules or regulations promulgated under any of the above statutes, or similar provisions of any federal, state or local statutory, administrative or common law.

    This exclusion applies only to Insuring Agreements D. Employment Practices Liability, D1. Third Party Sexual Harassment, and E. Fiduciary Liability.

**Professional @vantage**
**for Financial Institutions**

Management and Professional Liability Policy                    V. General Agreements and Conditions

**A.  LIMIT OF LIABILITY**

1.  The Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** which are covered under one or more of the Insuring Agreements that are subject to the Policy Year Shared Limit of Liability, as set forth in Item 8.e. of the Declarations, and which are first made against the **Insureds** during the same **Policy Year**, including, if exercised, the Extended Reporting Period, shall be the Policy Year Shared Limit of Liability set forth in Item 4. of the Declarations. The Policy Year Shared Limit of Liability shall be reduced and may be exhausted by payment of **Loss** under any such Insuring Agreements.

2.  With respect to any Insuring Agreement made a part of this **Policy** that is not subject to the Policy Year Shared Limit of Liability as set forth in Item 8.e. of the Declarations, the Insurer's maximum aggregate liability for all **Loss** on account of all **Claims** which are covered under such Insuring Agreement and which are first made against the **Insureds** during the same **Policy Year**, including, if exercised, the Extended Reporting Period, shall be the Limit of Liability for such Insuring Agreement set forth in Item 8.b. of the Declarations.

3.  **Defense Costs** shall be part of, and not in addition to, the applicable Limit of Liability set forth in Items 4. and 8. of the Declarations, and **Defense Costs** shall reduce and may exhaust such Limit(s) of Liability.

4.  If a **Claim** is subject to more than one separate Limit of Liability, the Insurer's maximum liability for such **Claim** shall be the largest unexhausted Limit of Liability applicable to such **Claim**, provided however (i) this paragraph does not apply to the Insurer's maximum liability for **Loss** covered under Insuring Agreement A. Insured Persons Liability if no retention applies to such **Loss** and if the Insuring Agreement A. Insured Persons Liability Limit of Liability is separate from the Limit(s) of Liability applicable to all other Insuring Agreements, and (ii) this paragraph creates a sublimit which further limits and does not increase the Insurer's maximum liability under this **Policy**.

5.  The Insurer's obligations for all **Claims** first made against the **Insureds** during the same **Policy Year** under each Insuring Agreement made part of this **Policy** shall cease once the applicable Limit of Liability has been exhausted by payment of **Loss**.

6.  The Limit of Liability for the Extended Reporting Period, if exercised, shall be part of and not in addition to, the applicable Limit of Liability for the **Policy Year** immediately preceding the Extended Reporting Period. The purchase of the Extended Reporting Period shall not increase or reinstate the applicable Limit of Liability for the **Policy Year** immediately preceding the Extended Reporting Period.

**B.  RETENTION AND INDEMNIFICATION**

1.  The Insurer shall only pay for covered **Loss**, including covered **Defense Costs**, in excess of the applicable retention for each **Claim** as set forth in Item 8.c. of the Declarations. No retention shall apply to **Loss** incurred by the **Insured Persons** for which the **Financial Institution** is:

(A)  not permitted or required by law to advance **Defense Costs** or indemnify the **Insured Persons**; or

(B)  permitted or required to advance **Defense Costs** or indemnify the **Insured Persons** but does not do so by reason of **Financial Impairment**.

2.  If the **Financial Institution** is permitted or required by law to advance **Defense Costs** or indemnify the **Insured Persons** for **Loss**, but fails to advance or indemnify such **Loss** for any reason other than **Financial Impairment**, then coverage under Insuring Agreement A. Insured Persons Liability shall be subject to the retention applicable to Insuring Agreement B. Financial Institution Indemnification.

3.  If **Loss** arising from a single **Claim** is subject to more than one retention, the applicable retention shall be applied separately to each part of such **Loss**, but the largest applicable retention set forth in Item 8.c. of the Declarations shall be the maximum retention applicable to all **Loss** arising from such **Claim**.

**C.  SINGLE CLAIM**

All **Claims** based upon or arising out of the same **Wrongful Act** or **Interrelated Wrongful Acts** committed by one or more **Insureds** shall be considered a single **Claim**, and only one retention and Limit of Liability shall apply to such single **Claim**. Each such single **Claim** shall be deemed to be first made on the date the earliest of such **Claims** was first made, regardless of whether such date is before or during the **Policy Period**.

**D.  ORDER OF PAYMENTS**

1.  If **Loss** resulting from one or more **Claims** is covered both under Insuring Agreement A. Insured Persons Liability and under one or more other Insuring Agreements which are subject to the same Limit of Liability as applies to Insuring Agreement A.

Form No. SCB002, Ed. 01 06

**Professional @vantage**
**for Financial Institutions**

Insured Persons Liability and if such potential or actual **Loss**, in the aggregate, in the Insurer's judgment could reasonably exceed such Limit of Liability, then the Insurer shall first pay such **Loss** which is covered under Insuring Agreement A. Insured Persons Liability, subject to such Limit of Liability. This Section V.D.1. shall not apply if the Insuring Agreement A. Insured Persons Liability Limit of Liability is separate from the Limit(s) of Liability applicable to all other Insuring Agreements.

2. The **Financial Impairment** of any **Insured** shall not relieve the Insurer of its obligation to prioritize payment of covered **Loss** under this **Policy** pursuant to this Subsection.

**E.   DEFENSE AND SETTLEMENT**

1. Amounts incurred as **Defense Costs** will reduce and shall be part of and not in addition to the applicable Limit of Liability. It shall be the duty of the **Insured** and not the duty of the Insurer to defend **Claims**. The **Insured** shall only retain counsel that is mutually agreed upon with the Insurer, consent for which shall not be unreasonably withheld.

2. The **Insured** agrees not to settle or offer to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the Insurer's prior written consent, which shall not be unreasonably withheld. The **Insured** will immediately advise the Insurer of any settlement demand. The Insurer shall not be liable for any **Defense Costs**, for any element of **Loss** incurred, for any obligation assumed, or for any admission made, by any **Insured** without the Insurer's prior written consent. The Insurer shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent.

3. The Insurer shall have the right but not the duty to effectively associate with the **Insured** in the settlement and defense of any **Claim** that appears reasonably likely to involve the Insurer. Such association shall include, but not be limited to, participation in the formation of litigation strategy, review of pleadings and other pertinent papers prior to filing, and participation in the settlement negotiations.

4. Only with respect to any **Claim** covered under Insuring Agreements D. Employment Practices Liability and D1. Third Party Sexual Harassment, if the **Insured** receives a settlement offer in such **Claim**

that the Insurer deems reasonable and the **Insured** withholds consent to such settlement, the Insurer's liability for all **Loss** on account of such **Claim** shall not exceed:

(A) the amount for which the **Claim** could have been settled; plus

(B) **Defense Costs** accrued as of the date such settlement was proposed; plus

(C) fifty (50%) percent of the covered **Loss**, including **Defense Costs** incurred in excess of the amounts in (A) and (B) above.

Notwithstanding the foregoing, if the proposed settlement amount does not exceed the applicable retention set forth in the Item 8.c. of the Declarations, paragraph (C) above shall not apply and the Insurer's liability for all **Loss** arising from such **Claim** shall not exceed the amount for which the **Claim** could have been settled plus **Defense Costs** incurred as of the date such settlement was proposed. Any amounts paid by the Insurer under paragraphs (A), (B), or (C) above shall be part of and not in addition to the applicable Limit of Liability set forth in Item 8. of the Declarations.

**F.   ADVANCEMENT OF DEFENSE COSTS**

1. Subject to Section V.K., the Insurer, if requested by the **Insured**, shall advance covered **Defense Costs** on a current basis, except when advancement of **Defense Costs** is prohibited by law or regulation. The **Insured** shall repay any advanced **Defense Costs** to the Insurer in the event it is established that the Insurer has no liability under this **Policy** for such **Defense Costs**.

2. Prior to advancing or indemnifying **Defense Costs**, the Insurer shall be entitled to sufficient information and documentation as to the amount and purpose of any **Defense Costs** to enable it to evaluate the reasonableness and necessity of such **Defense Costs** and to verify that such **Defense Costs** were actually incurred.

**G.   NOTICE OF CLAIMS AND POTENTIAL CLAIMS**

1. The **Insured**, as a condition precedent to any rights under this **Policy**, shall give the Insurer written notice of any **Claim** made against the **Insureds** as soon as practicable, but in no event later than sixty (60) days after expiration of the **Policy Year** in which the **Claim** was first made or the expiration of the Extended Reporting Period, if exercised.

**Professional @vantage**
**for Financial Institutions**

| Management and Professional Liability Policy | V. General Agreements and Conditions |

2. If during the **Policy Period**, any titled officer, branch manager or risk manager of the **Insured** first becomes aware of circumstances which may give rise to a **Claim**, and gives written notice to the Insurer of the circumstances and the reasons for anticipating a **Claim**, then any **Claim** subsequently made which arises out of such circumstances shall be deemed to have been first made during the **Policy Year** in which notice of such circumstances was first given to the Insurer. As a condition precedent to any coverage hereunder for such **Claims**, such notice of circumstances must be specific and contain full particulars as to the names, dates, and persons involved in the underlying facts potentially giving rise to the **Claim**, as well as the identity of the potential plaintiffs and the causes of action to be asserted.

3. All notices required to be given to the Insurer under this **Policy** as described in paragraphs 1. and 2. above shall be given to the Insurer at the respective address set forth in Item 6. of the Declarations.

H. **NEW SUBSIDIARIES AND CHANGES IN BUSINESS ACTIVITIES**

1. If during the **Policy Period** the **Financial Institution**:

   (A) acquires voting securities in or creates another organization which as a result of such acquisition or creation becomes a **Subsidiary**; or

   (B) acquires another organization by merger into or consolidation with the **Financial Institution**; or

   (C) creates a **Benefit Plan**; or

   (D) acquires a **Benefit Plan** through merger into or consolidation with the **Financial Institution**;

   then, subject to Section V.H.2. below and all other terms, conditions and limitations of this **Policy**, such organization, or **Benefit Plan**, and its **Insureds** shall be covered under this **Policy** but only with respect to **Wrongful Acts** occurring after such acquisition or creation.

2. If the total assets of such created or acquired organization equal or exceed:

   (A) twenty-five percent (25%) of the **Financial Institutions'** total assets at the time of the acquisition, or

   (B) $250,000,000;

or, with respect to a created or acquired **Benefit Plan**, if the total assets of such acquired **Benefit Plan** equal or exceed:

   (A) twenty-five percent (25%) of the total assets of all **Benefit Plans** at the time of the acquisition,

then coverage under this **Policy** for such organization, or **Benefit Plan**, and its **Insureds** as provided in Section V.H.1. above shall cease ninety (90) days after the effective date of such acquisition or the end of the **Policy Period**, whichever is sooner ("Automatic Coverage Period") unless, as a condition precedent to further coverage for such organization and its **Insureds**:

   (A) the **Named Insured** shall give written notice of such acquisition to the Insurer as soon as practicable, but in no event later than forty-five (45) days following the effective date of such creation or acquisition, and shall thereafter promptly provide to the Insurer such information as the Insurer may request; and

   (B) the **Named Insured** promptly agrees to any special terms, conditions and/or exclusions, and pays any additional premium, required by the Insurer.

If the **Named Insured** fails to comply with such conditions precedent, coverage otherwise afforded by this **Policy** for such organization and its **Insureds** shall terminate upon expiration of the Automatic Coverage Period.

3. If during the **Policy Period** the **Financial Institution**:

   (A) creates or acquires a financial services holding company or converts from a bank holding company to a financial services holding company, or

   (B) converts from a mutual company to a stock company,

then as a condition precedent to coverage for such **Financial Institution** and its **Insureds** for  laims for **Wrongful Acts** occurring after such transaction:

   (A) the **Financial Institution** shall give written notice of such transaction to the Insurer as soon as practicable, but in no event later than forty-five (45) days following the effective date of such transaction, and shall thereafter promptly provide to the Insurer such information as the Insurer may request; and

Form No. SCB 002, Ed. 01-06

**Professional @vantage**
**for Financial Institutions**

Management and Professional Liability Policy

V. General Agreements and Conditions

(B) the **Financial Institution** shall promptly agree to any special terms, conditions and/or exclusions, and shall pay any additional premium, required by the Insurer.

If the **Financial Institution** fails to comply with such conditions precedent, no coverage shall be afforded by this **Policy** for such **Financial Institution** and its **Insureds** for **Claims** for **Wrongful Acts** occurring after the effective date of such transaction.

4. If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage under this **Policy** with respect to each **Subsidiary** and its **Insureds** shall continue until termination of the **Policy Period**, but only with respect to **Claims** for **Wrongful Acts** occurring prior to the date such organization ceased to be a **Subsidiary**.

5. If the **Financial Institution** terminates a **Benefit Plan** before or after the inception date set forth in Item 2 of the Declarations, coverage under this **Policy** with respect to such terminated **Benefit Plan** and its **Insureds** shall continue until termination of this **Policy** for those who were **Insureds** prior to or at the time of such **Benefit Plan** termination or who would have been **Insureds** at the time of such termination if this **Policy** had the been in effect. Such continuation of coverage shall apply with respect to **Claims** for **Wrongful Fiduciary Acts** occurring prior to or after the date the **Benefit Plan** was terminated.

I. CANCELLATION AND NONRENEWAL

1. This **Policy** shall terminate at the earliest of the following times:

(A) the effective date of cancellation specified in a prior written notice by the **Named Insured** to the Insurer; or

(B) upon expiration of the **Policy Period**; or

(C) twenty (20) days after receipt by the **Named Insured** of a written notice of cancellation of this **Policy** from the Insurer for nonpayment of premium, unless the premium is paid within such twenty (20) day period. Notice will be mailed to the **Named Insured** by certified mail to the address set forth in Item 1. of the Declarations. The mailing of such notice aforesaid shall be sufficient proof of notice, and this **Policy** shall terminate at the date and hour specified in such notice.

2. The Insurer may not cancel this **Policy** before expiration of the **Policy Period**, except as provided above for the non-payment of premium. The Insurer

shall refund the unearned premium computed at customary short rates if this **Policy** is cancelled by the **Named Insured**. Under any other circumstances, the refund shall be computed prorata. The return of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of such cancellation, but such payment shall be made as soon as practicable.

J. CONVERSION

1. Upon the occurrence of any of the following events, this **Policy** shall continue in full force and effect until termination of this **Policy**, but only with respect to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such event. Coverage shall cease as of the effective date of such event with res ect to **Claims** for **Wrongful Acts** committed or allegedly committed after such event:

(A) **Financial Impairment** of the **Named Insured** or any **Subsidiary** comprising more than fifty percent (50%) of the **Named Insured's** total assets;

(B) the merger or consolidation of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity;

(C) acquisition by a ny person, entity or group of persons or entities acting in concert of all or substantially all of the assets of the **Named Insured** or of rights resulting in such person, entity or group having the right to elect, appoint or designate at least 50% of the directors or equivalent executives of the **Named Insured**; or

(D) the **Named Insured** ceasing to engage actively in its primary business.

2. This **Policy** may not be cancelled by the **Named Insured** after such an event, and the entire premium for this **Policy** shall be deemed fully earned as of the effective date of such an event. The occurrence of any such event shall not affect the **Insured's** right to purchase the Extended Reporting Period pursuant to Section II.C.

3. In the event of **Financial Impairment** of a **Subsidiary** comprising less than fifty percent (50%) of the **Named Insured's** total assets, this Section V.J. shall apply only to such **Subsidiary** and its direct or indirect **Insureds**, and the **Policy** shall continue in full force with respect to all other **Insureds**.

**Professional @vantage**
for Financial Institutions

Management and Professional Liability Policy        V. General Agreements and Conditions

K. **ALLOCATION**

1. If in any **Claim** the **Insureds** are jointly and severally liable with others (including the **Financial Institution** if no coverage is afforded under this **Policy** for such **Claim** against the **Financial Institution**) for **Loss** otherwise covered under this **Policy**, then:

    (A) 100% of all such **Loss** incurred jointly by the **Insured Persons** and the **Financial Institution** shall be treated as **Loss** incurred solely by the **Insured Persons**; and

    (B) all other **Loss** shall be allocated between the **Insureds** and others based on the relative legal exposures of the parties to such **Claims**.

2. If in any **Claim** the **Insureds** incur an amount consisting of both covered **Loss** and uncovered loss because the **Claim** includes both covered and uncovered matters, then the amount shall be allocated between covered **Loss** and uncovered loss based on the relative legal exposures of the **Insureds** to the covered and uncovered matters.

3. The **Insureds** and the Insurer agree to use their best efforts to reach a proper allocation of **Defense Costs**. If the **Insured** and the Insurer cannot agree on an allocation:

    (A) no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

    (B) the Insurer shall advance on a current basis **Defense Costs** which the Insurer believes to be covered under this **Policy** until a different allocation is negotiated, arbitrated or judicially determined; and

    (C) the Insurer, if requested by the **Insured**, shall submit the allocation dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel. The arbitration panel shall consist of one arbitrator selected by the **Insured**, one arbitrator selected by the Insurer, and a third independent arbitrator selected by the first two arbitrators. In any such arbitration, each party will bear its own legal fees and expenses.

4. Any negotiated, arbitrated or judicially determined allocation of **Defense Costs** will be applied retroactively to all **Defense Costs**, notwithstanding any prior advancement to the contrary. Any allocation or advancement of **Defense Costs** shall not apply to or create any presumption with respect to the allocation of other **Loss** arising from such **Claim** or any other **Claim**.

L. **REPRESENTATIONS**

1. It is agreed and represented that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy**. By acceptance of this **Policy**, the **Insureds** agree that:

    (A) such **Application** shall be construed as a separate **Application** for coverage by each **Insured Person**;

    (B) this **Policy** shall not be deemed to be a series of individual insurance contracts with each **Insured**; and

    (C) the statements in the **Application** are the **Insureds'** representations, such representations are material to the acceptance of the risk or hazard assumed by the Insurer under this **Policy**, and this **Policy** is issued in reliance upon the truth of such representations.

M. **SEVERABILITY**

1. The **Insureds** agree that in the event the **Application** contains misrepresentations or omissions (i) which materially affect the risk or hazard assumed by the Insurer under this **Policy**, or (ii) made with the actual intent to deceive, then no coverage will be provided under this **Policy** with respect to:

    (A) any **Insured Person** who knew of any fact, circumstance or situation that was not truthfully disclosed in the **Application**;

    (B) the **Financial Institution**, to the extent the **Financial Institution** indemnifies the **Insured Person** reflected in paragraph (A) above; or

    (C) the **Financial Institution**, to the extent coverage is granted to the **Financial Institution** by any Insuring Agreement made a part of this **Policy**, if any past, present, or future chief financial officer, in-house general counsel, chief executive officer, President or Chairman of the Board of any **Financial Institution**, or any person holding any equivalent position within any **Financial Institution** (regardless of title), knew of any fact, circumstance or situation that was not truthfully disclosed in the **Application**;

**Professional @vantage**
for Financial Institutions

| Management and Professional Liability Policy | V. General Agreements and Conditions |

whether or not the **Insured Person** or such director or officer actually knew the misrepresentation or omission was made in the **Application**.

**N. SEVERABILITY OF EXCLUSIONS**

1. With respect to the Exclusions in this **Policy**, in order to determine if coverage is available:

   (A) no fact pertaining to or knowledge possessed by any **Insured Person** will be imputed to any other **Insured Person**; and

   (B) only facts pertaining to and knowledge possessed by any past, present, or future chief financial officer, in-house general counsel, chief executive officer, President or Chairman of the Board of the **Financial Institution**, or any person holding any equivalent position within the **Financial Institution** (regardless of title), shall be imputed to the **Financial Institution**.

**O. SUBROGATION**

In the event of any payment under this **Policy**, the Insurer shall be subrogated to the extent of such payment to all the **Insured Persons'** and the **Financial Institution's** rights to recovery therefor, and the **Insured** shall execute all papers required and shall do everything that may be necessary to secure the Insurer's rights, including the execution of such documents as may be necessary to enable the Insurer effectively to bring suit in the name of the **Insured Persons** or the **Financial Institution**.

**P. ASSIGNMENT AND ACCEPTANCE**

By acceptance of this **Policy**, the **Insured** and the Insurer agree that this **Policy**, including the **Application** and any written Endorsements attached thereto, constitute the entire agreement between the parties. Assignment of interest under this **Policy** shall not bind the Insurer until its consent to such assignment is endorsed hereon.

**Q. CONFORMITY TO STATUTE**

Any terms of this **Policy** which are in conflict with the terms of any applicable laws governing this **Policy** are hereby amended to conform to such laws.

**R. AUTHORIZATION**

By acceptance of this **Policy**, the **Insureds** agree that the **Named Insured** will act on behalf of all **Insureds** for all purposes under this **Policy** including, but not limited to, giving and receiving of all notices and correspondence, cancellation, nonrenewal or

termination of this **Policy**, payment of premiums, the negotiation and acceptance of Endorsements, and receipt of any return premiums that may be due under this **Policy**.

**S. CHANGES**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer shall not effect a waiver or a change in any part of this **Policy** or estop the Insurer from asserting any right under the terms of this **Policy**, nor shall the terms, conditions and limitations of this **Policy** be waived or changed, except by written Endorsement issued to form a part of this **Policy**.

**T. ACTION AGAINST THE INSURER**

1. No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this **Policy**, and until the **Insured's** obligation to pay is finally determined, either by adjudication or by written agreement of the **Insureds**, the claimant, and the Insurer.

2. No person or organization shall have any right under this **Policy** to join the Insurer as a party to any **Claim** against the **Insured** nor shall the Insurer be impleaded by the **Insureds** or their legal representatives in any such **Claim**.

**U. OTHER INSURANCE OR INDEMNIFICATION**

1. This **Policy** shall not be subject to the terms of any other insurance. Any coverage under this **Policy** shall be specifically excess to:

   (A) any other existing insurance regardless of whether collectable, including but not limited to, any insurance under which there is a duty to defend, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided by this **Policy**; and

   (B) indemnification to which an **Insured** is entitled from any entity other than the **Financial Institution**.

**V. LOSS INFORMATION**

The Insurer will provide **Loss Information** to the **Financial Institution** within ten (10) days of the **Financial Institution's** request or, if required by statute, at the same time as any notice of cancellation or nonrenewal of this **Policy**.

**Professional @vantage**
**for Financial Institutions**

Management and Professional Liability Policy                    V. General Agreements and Conditions

**W.  INSOLVENCY/BANKRUPTCY**

The **Financial Impairment** of the **Insured** or of the estate of such **Insured** shall not release the Insurer from its obligations nor deprive the Insurer of its rights under this **Policy**.

**X.  HEADINGS AND SUB-HEADINGS**

The descriptions in the headings and sub-heading of this **Policy** are solely for convenience and form no part of the terms and conditions of coverage.

IN WITNESS WHEREOF, the Insurer has caused this **Policy** to be signed by its President and Secretary.

_____                    _____
Secretary                                           President

**NOTICE OF TERRORISM INSURANCE COVERAGE**



**Management and Professional Liability**

You are hereby notified that under the Terrorism Risk Insurance Act, as extended on December 22, 2005, that you now have a right to purchase insurance coverage for losses, resulting from acts of terrorism, as defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property; or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

You should know that where coverage is provided by this policy for losses caused by certified acts of terrorism such losses may be partially reimbursed by the United States Government under a formula established by Federal law. Under this formula, the United States Government pays 90% (85% in 2007) of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

TERRORISM COVERAGE IS PROVIDED ON THIS POLICY AT $0 PREMIUM. NO ADDITIONAL ACTION IS REQUIRED ON YOUR PART TO BE COVERED FOR LOSSES ARISING FROM TERRORIST ACTS.

<u>All other terms of your policy remain the same.</u>

<u>To be attached to</u>
Policy No.: 474-00-06-11-0000
Insured: PARK AVENUE BANCORP, INC.

Form Nos. SCB201, Ed. 01-06; SCB202, Ed. 01-06                                    Page 1 of 1
ARCHIVE

**ADDITIONAL INSURED ENDORSEMENT**



__Management and Professional Liability__

It is agreed that the following specified entity (or entities) is added to definition 12. **Financial Institution** in Section III. of this **Policy**:

Mid-Atlantic Investment Company, LLC

The Park Avenue Bank

All other terms of your policy remain the same.

__To be attached to__                                    __This endorsement shall become effective__
**Policy No.:** 474-00-06-11-0000                        __as of 12:01 a.m. on__ 09/09/2008
**Insured:** PARK AVENUE BANCORP, INC.

Form No. SCB405, Ed. 01-06; SCB854, Ed. 01-06                              Page 1 of 1
ARCHIVE

AMEND ILLEGAL PROFIT EXCLUSION TO FINAL
ADJUDICATION



**Management and Professional Liability**

It is agreed that the following replaces exclusion 20.
**Illegal Profit or Payment** in Section IV. of this **Policy:**

20. **Illegal Profit or Payment** – The Insurer shall
not be liable to make any payment for **Loss,**
other than **Defense Costs,** in connection with
any **Claim** against an **Insured** arising out of or in
any way involving:

    (A)  such **Insured** gaining any profit, remun-
eration, or financial advantage to which
such **Insured** was not legally entitled if a
final judgment or adjudication adverse to
such **Insured** establishes such **Insured**
was not legally entitled to such profit, re-
muneration or financial advantage; or

    (B)  the **Financial Institution** paying inadequate
or excessive consideration in connection
with its purchase of **Financial Institution**
securities.

**This exclusion applies to all Insuring Agree-
ments except D. Employment Practices Liability.**

All other terms of your policy remain the same.
**To be attached to**
Policy No.: 474-00-06-11-0000
Insured: PARK AVENUE BANCORP, INC.

**This endorsement shall become effective
as of 12:01 a.m. on** 09/09/2008

**NEW YORK AMENDATORY
ENDORSEMENT – REGULATION 121**



<u>**Management and Professional Liability**</u>

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

A. It is agreed that the following replaces parts 1., 2., 5., and 6. in Section II.C. of this **Policy**:

   C. <u>**EXTENDED REPORTING PERIOD**</u>

   1. If the Insurer or the **Named Insured** cancels or fails or refuses to renew this **Policy**, or if there is a change in coverage less favorable to the **Insured**, the **Insured** shall automatically be provided an extension of sixty (60) days following the date of cancellation or nonrenewal of the **Policy** or such change in coverage in which to give written notice of **Claims** first made against the **Insured** during such sixty-day period, but only with respect to any **Wrongful Acts** taking place before the effective date of such cancellation, nonrenewal or change in coverage, and otherwise within the coverage afforded by this **Policy**.

   2. If this **Policy** converts subject to Section V.J.1.(b) or (c) or if either the Insurer or the **Named Insured** cancels or fails or refuses to renew the **Policy**, or if there is a change in coverage less favorable to the **Insured**, the **Insured** shall have the right, upon payment of an additional premium, to an optional extended reporting period (herein called the Extended Reporting Period) and an extension of the coverage granted by this Policy for the duration of time set forth in Item 5. of the Declarations.

   3. The Extended Reporting Period shall follow the effective date of cancellation or the date of expiration of the **Policy** or such change in coverage less favorable to the **Insured**. The Extended Reporting Period shall apply to Claims first made against the **Insured** during such optional Extended Reporting Period, but only with respect to any **Wrongful Acts** taking place before the effective date of such cancellation, nonrenewal or change in coverage, and otherwise within the coverage afforded by this **Policy**. Notwithstanding the foregoing, the **Insured** shall not be entitled to purchase the optional Extended Reporting Period coverage if this **Policy** has been in effect for less than one year and is not a renewal, and the **Policy** is terminated for non-payment of premium or for fraud.

   4. Within thirty (30) days after cancellation or nonrenewal of the **Policy** or a change in coverage less favorable to the **Insured**, the Insurer will advise the **Named Insured** in writing of the automatic sixty-day extension referred to in part 1. above and the availability of, the premium for and the importance of purchasing the optional Extended Reporting Period coverage referred to in parts 2. and 3. above. If the **Policy** is cancelled due to non-payment of premium or fraud on the part of the **Insured**, the Insurer shall not be required to provide a premium quotation for optional Extended Reporting Period coverage unless requested by the **Insured**.

   5. The **Insured** shall have the greater of the following in which to submit written acceptance of the optional Extended Reporting Period coverage:

     (A) sixty (60) days from the effective date of termination of the **Policy**, or

     (B) thirty (30) days from the date of mailing or delivery of the advice referred to in part 4. above.

   Written notice of the **Insured's** election to purchase the optional Extended Reporting Period coverage, together with the additional premium therefore, must be received by the Insurer within the time prescribed by this part 5.

<u>All other terms of your policy remain the same.</u>

<u>**To be attached to**</u>
**Policy No.:** 474-00-06-11-0000
**Insured:** PARK AVENUE BANCORP, INC.

<u>**This endorsement shall become effective as of 12:01 a.m. on**</u> 09/09/2008

Form No. SCB662, Ed. 01-06       ARCHIVE

**NEW YORK AMENDATORY
ENDORSEMENT – REGULATION 121**

 **OneBeacon**
I N S U R A N C E

Management and Professional Liability

6. For the purpose of determining the length of the optional Extended Reporting Period in parts 2. and 3. above, the sixty (60) day extension in part 1. above shall be included in the optional Extended Reporting Period.

7. The coverage provided for in this endorsement shall be deemed part of the **Policy Period** and not in addition thereto. Where the **Named Insured** has been afforded insurance coverage under a Policy or Policies issued by the Insurer for at least three (3) years continuously, exclusive of any Extended Reporting Period, the aggregate Limit of Liability for the optional Extended Reporting Period coverage shall be equal to one hundred (100%) of the aggregate Limit of Liability for this **Policy**. Where the **Named Insured** has been afforded insurance coverage under a Policy or Policies issued by the Insurer for less than three (3) continuous years, the aggregate Limit of Liability for the optional Extended Reporting Period shall be equal to (a) the amount of coverage remaining in the **Policy's** aggregate Limit of Liability or (b) fifty percent (50%) of the aggregate Limit of Liability for the **Policy**, whichever is greater. Notwithstanding the foregoing, if the Insured is entitled to Extended Reporting Period coverage due to a decrease in limits, reduction in coverage, increased deductible or self-insured retention, new exclusion or other change in coverage less favorable to the **Insured**, then the optional Extended Reporting Period coverage provided shall apply only in regard to that coverage terminated.

8. If this Policy has been issued to a corporation, any **Insured Person** under the **Policy** may purchase additional Extended Reporting Period coverage pursuant to parts 2. and 3. above, provided:

   (A) such entity has been placed in liquidation or bankruptcy or permanently ceases operations;

   (B) the entity or its designated trustee does not purchase Extended Reporting Period coverage that may be available pursuant to parts 2. and 3. above; and

   (C) such **Insured Person** requests the Extended Reporting Period coverage and pays the appropriate premium within one hundred twenty (120) days of the termination of coverage.

   The premium charge for coverage to such an **Insured Person** shall be commensurate with such coverage. The Insurer shall have no obligation to provide notice to any **Insured Person** of the availability of the additional Extended Reporting Period coverage pursuant to this paragraph.

9. The offer of a renewal **Policy** with an increase in premium shall not be deemed a change in coverage less favorable to the **Insured**.

B. It is agreed that parts 3. and 4. in Section II.C. of this **Policy** are renumbered as 10. and 11., respectively.

_____

Authorized Representative

_____

Date

All other terms of your policy remain the same.

**To be attached to**
**Policy No.:** 474-00-06-11-0000
**Insured:** PARK AVENUE BANCORP, INC.

**This endorsement shall become effective as of 12:01 a.m. on** 09/09/2008

Form No. SCB662, Ed. 01-06

Page 2 of 2

**NEW YORK AMENDATORY**
**ENDORSEMENT – REGULATION 162**



**Management and Professional Liability**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is agreed that the following is added to Section V.E. of this **Policy**:

5. To the extent this **Policy** affords coverage for Defense Costs incurred in defending demand(s) or suit(s) for non-monetary relief only or criminal proceeding(s), not more than twenty-five percent (25%) of the applicable Limit of Liability may be reduced by the Insurer's payment of **Defense Costs** associated with such **Claims** and the Insurer shall not be liable for **Defense Costs** in excess thereof.

6. The Insurer shall not be obligated to pay for any **Defense Costs** upon:

   (A) a final adjudication of the **Claim** adverse to the **Insured** or the **Insured** being found to have, in fact, committed an alleged **Wrongful Act** involving dishonest, fraudulent or intentional acts, the intentional violation of a statute, or the intentional gaining of profits to which the **Insured** was not legally entitled; or

   (B) the exhaustion of an applicable Limit of Liability.

7. Coverage for criminal proceedings is limited to that permitted by Business Corporation Law section 726, Not-For-Profit Corporation Law section 726, and Banking Law section 7023, whichever is applicable.

8. Nothing in this **Policy** shall be construed to prevent an **Insured** from making a complaint to the appropriate Appellate Division of the New York State Supreme Court, or other body designated by the Appellate Division to investigate complaints in accordance with Judiciary Law section 90, or to the appropriate disciplinary body in the State where the legal services are being provided.

_____

Authorized Representative

_____

Date

All other terms of your policy remain the same.

**To be attached to**
Policy No.:  474-00-06-11-0000
**Insured:** PARK AVENUE BANCORP, INC.

**This endorsement shall become effective as of 12:01 a.m. on** 09/09/2008

Form No. SCB663 Ed. 01-06          ARCHIVE          Page 1 of 1

**NEW YORK CHANGES –
CANCELLATION AND NONRENEWAL**



**One Beacon.**
I N S U R A N C E

<u>**Management and Professional Liability**</u>

---

> NOTICE: THESE POLICY FORMS AND THE
> APPLICABLE RATES ARE EXEMPT FROM THE
> FILING REQUIREMENTS OF THE NEW YORK
> STATE INSURANCE DEPARTMENT. HOWEVER,
> SUCH FORMS AND RATES MUST MEET THE
> MINIMUM STANDARDS OF THE NEW YORK
> INSURANCE LAW AND REGULATIONS.

It is agreed that:

The following is added to part 1.(C) of Section V.I. of this **Policy**:

> Notice of cancellation for nonpayment of premium shall inform the first **Named Insured** of the amount due.

The following is added to Section V.I. of this **Policy**:

3. If the Insurer:

   (A) does not renew this **Policy**; or

   (B) conditionally renews this **Policy** subject to a:

      (i) change of limits;

      (ii) change in type of coverage;

      (iii) reduction of coverage;

      (iv) increased deductible or Retention amount;

      (v) addition of exclusion; or

      (vi) increased premiums in excess of 10%, exclusive of any premium increase due to and commensurate with **Insured** value added or increased exposure units; or as a result of experience rating, loss rating, retrospective rating or audit;

   the Insurer will mail or deliver written notice to the first **Named Insured** shown in the Declarations at least 60 but not more than 120 days before:

   (A) the expiration date; or

   (B) the anniversary date if this is a continuous policy.

Notice will be mailed or delivered to the first **Named Insured** at the address shown in the **Policy** and to the authorized agent or broker. If notice is mailed, proof of mailing will be sufficient proof of notice. Notice will include the specific reason(s) for nonrenewal or conditional renewal, including the amount of any premium increase for conditional renewal and description of any other changes.

4. If the Insurer violates any of the provisions of part 3. above by sending the first **Named Insured** an incomplete or late conditional renewal notice or a late nonrenewal notice:

   (A) Coverage will remain in effect at the same terms and conditions of this **Policy** at the lower of the current rates or the prior **Policy Period's** rates until 60 days after such notice is mailed or delivered, unless the first **Named Insured**, during this 60 day period, has replaced the coverage or elects to cancel.

   (B) On or after the expiration date of this **Policy**, coverage will remain in effect at the same terms and conditions of this **Policy** for another **Policy Period**, at the lower of the current rates or the prior **Policy Period's** rates, unless the first **Named Insured**, during this additional **Policy Period**, has replaced the coverage or elects to cancel.

5. If the **Insured** elects to renew on the basis of a late conditional renewal notice, the terms, conditions and rates set forth in such notice shall apply:

   (A) upon expiration of the 60 day period; or

   (B) notwithstanding the provisions in parts 4.(A) and (B) above, as of the renewal date of the **Policy** if the Insurer sends the first **Named Insured** the conditional renewal notice at least 30 days prior to the expiration or anniversary date of the **Policy**.

<u>All other terms of your policy remain the same.</u>

<u>**To be attached to**</u>
**Policy No.:** 474-00-06-11-0000
**Insured:** PARK AVENUE BANCORP, INC.

<u>**This endorsement shall become effective
as of 12:01 a.m. on**</u> 09/09/2008

Form No. SCB664, Ed. 01-06          ARCHIVE                              Page 1 of 2

**NEW YORK CHANGES —**
**CANCELLATION AND NONRENEWAL**

 **OneBeacon.**
I N S U R A N C E

<u>**Management and Professional Liability**</u>

6. The Insurer will not send the **Insured** notice of nonrenewal or conditional renewal if the **Insured**, the **Insured's** authorized agent or broker or another insurer of the **Insured's** mails or delivers notice that the **Policy** has been replaced or is no longer desired.

7. Any extension of the **Policy Period** pursuant to parts 4. or 5. above shall not create a new aggregate Insuring Agreement or Policy Year Shared Limit of Liability for the **Policy**, except that the applicable aggregate Insuring Agreement or Policy Year Shared Limit of Liability of the expiring **Policy** shall be increased in proportion to the length of the extension of the **Policy Period** pursuant to such parts 4. or 5. above. In the event the **Named Insured** elects to accept the terms, conditions and rates of the conditional renewal notice pursuant part 3.(B) above, the Limits of Liability of the renewal policy shall govern as of the effective date of the renewal.

<u>All other terms of your policy remain the same.</u>

<u>**To be attached to**</u>
**Policy No.:** 474-00-06-11-0000
**Insured:** PARK AVENUE BANCORP, INC.

<u>**This endorsement shall become effective**</u>
<u>**as of 12:01 a.m. on**</u> 09/09/2008

Form No. SCB662, Ed. 01-06

Page 2 of 2

NEW YORK CHANGES –
PROFESSIONAL LIABILITY POLICY



Management and Professional Liability

NOTICE: THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE
FILING REQUIREMENTS OF THE NEW YORK
STATE INSURANCE DEPARTMENT. HOWEVER,
SUCH FORMS AND RATES MUST MEET THE
MINIMUM STANDARDS OF THE NEW YORK
INSURANCE LAW AND REGULATIONS.

THIS ENDORSEMENT CHANGES THE POLICY.
PLEASE READ IT CAREFULLY.

It is agreed that:

I.    If this **Policy** affords coverage for **Wrongful
      Employment Acts** or **Wrongful Third Party
      Harassment Acts**, such coverage is limited to
      **Claims** of disparate impact or vicarious liability
      only.

II.   The following is added to Section II.A. of this
      **Policy**:

      3.   Bankruptcy or insolvency of the **Insured** or
           **Insured's** estate shall not relieve the Insurer
           of its obligations under this **Policy**.

III.  The following is deleted from the first paragraph
      of definition 26. **Loss**: "punitive or exemplary
      damages, the multiple portion of any multiplied
      damage award".

IV.   The following replaces definition 32. **Pollutants**
      of this **Policy**:

      32.  **Pollutants** means any substance exhibiting
           hazardous characteristics as is or may be
           identified on any list of hazardous substances
           issues by the United States Environmental
           Protection Agency, or any state, local, or
           foreign counterpart. This definition shall
           include, without limitation, any solid, liquid,
           gaseous or thermal irritant, or contaminant,
           including smoke, vapor, soot, fumes, acids,
           alkalis, chemicals, odors, oil or oil products,
           radiation, asbestos or asbestos-containing
           products, waste (including material to be
           recycled, reconditioned or reclaimed), as well
           as any air emission, waste water, infectious
           medical waste, nuclear materials, or nuclear
           waste.

V.    The following is added to Section V.A. of this
      **Policy**:

      7.   If the Insurer concludes that, based on any
           **Claims** which have been reported and to
           which this insurance may apply, the insur-
           ance afforded by this **Policy** is likely to be
           exhausted by the payment of **Loss**, the Insurer
           will provide written notice to that effect to the
           **Named Insured** at the address shown in the
           Declarations.

      In the event one or more of the applicable
      Limits of Liability shown in the Declarations
      is/are exhausted by the payment of **Loss**:

      (A)  The insurer will notify the **Named
           Insured** in writing, as soon as practi-
           cable, that:

           (i)   such a Limit of Liability has actually
                 been exhausted; and

           (ii)  if the Insurer has assumed the
                 defense of any **Claims**, that the
                 Insurer's duty to defend **Claims** and
                 suits seeking **Loss** subject to that
                 applicable Limit of Liability also has
                 ended.

      (B)  The Insurer will initiate, and cooperate in,
           the transfer of control, to any appropriate
           **Insured** all **Claims** and suits seeking
           **Loss** which are subject to that Limit of
           Liability and which are reported to the
           Insurer before that Limit of Liability is
           exhausted. The **Insured** must cooperate
           in the transfer of control said **Claims** and
           suits.

      If the Insurer has assumed the defense
      of any **Claim**, the Insurer agrees to take
      such steps, as it deems appropriate, to
      avoid a default in, or continue the defense
      of, any **Claims** or suits until such transfer
      is completed, provided the appropriate
      **Insured** is cooperating in completing
      such transfer.

All other terms of your policy remain the same.

**To be attached to**
Policy No.:  474-00-06-11-0000
Insured: PARK AVENUE BANCORP, INC.

**This endorsement shall become effective
as of 12:01 a.m. on** 09/09/2008

Form No. SCB665, Ed. 01-06          ARCHIVE

**NEW YORK CHANGES –**
**PROFESSIONAL LIABILITY POLICY**



OneBeacon.
I N S U R A N C E

Management and Professional Liability

The Insurer will take no action whatsoever with respect to any **Claim** or suit seeking **Loss** that would have been subject to that Limit of Liability, had it not been used up, if the **Claim** or suit is reported to the Insurer after that Limit of Liability has been exhausted.

(C) The **Named Insured** shown in the Declaration and any other **Insured** involved in suit seeking **Loss** subject to the applicable Limit of Liability must arrange for the defense of such **Claim** or suit within such time period as agreed to between the appropriate **Insured** and the Insurer. Absent any such agreement, arrangement for the defense of such **Claim** or suit must be made as soon as practicable.

(D) The **Insured** shall reimburse the Insurer for expenses incurred by the Insurer in taking those steps the Insurer deems appropriate in accordance with part (B) above. The **Insured's** duty to reimburse the Insurer will begin on:

(i) the date on which the applicable Limit of Liability is exhausted, if the Insurer sent notice in accordance with part (A) above; or

(ii) the date on which the Insurer sent notice in accordance with part (B) above, if the Insurer did not send notice in accordance with part (A) above.

(E) The exhaustion of any Limit of Liability by the payment **Loss**, including **Defense Costs**, and the resulting end of the Insurer's duty to defend, will not be affected by the Insurer's failure to comply with any of the provisions of this Endorsement.

VI. The following replaces V.G. 1 of this Policy:

1. The **Insureds** shall report every **Claim** to the Insurer as soon as practicable. Failure to give the Insurer any notice required to be given under this **Policy** shall not invalidate coverage for any **Claim** made against an **Insured** if it shall be shown not to have been reasonably possible to give such notice within the prescribed time and that notice was given as soon as reasonably possible.

VII. Notwithstanding Section V.G. of this **Policy**, notice of **Claim** given by or on behalf of the **Insured** to any licensed agent of the Insurer in New York State, with particulars sufficient to identify the **Parent Organization**, shall be deemed notice to the Insurer.

VIII. The following replaces Section V.L.1.(C) of this **Policy**:

(C) The **Insureds** represent that the statements and representations contained in the **Application** are true, accurate and complete. This **Policy** is issued in reliance upon the truth of such statements and representations.

IX. The following replaces Section V.M.1.(A) of this **Policy**:

(A) any **Insured Person** who knew of any fact, circumstance or situation that was not truthfully disclosed in the **Application**, provided that such knowledge shall not be imputed to any other **Insured Person**;

X. The following replaces Section V.T. of this **Policy**:

T. ACTION AGAINST THE INSURER

1. No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this **Policy**, and until the **Insured's** obligation to pay is finally determined, either by judgment against the **Insureds** or by written agreement of the **Insureds**, the claimant, and the Insurer.

All other terms of your policy remain the same.

**To be attached to**
Policy No.: 474-00-06-11-0000
Insured: PARK AVENUE BANCORP, INC.

**This endorsement shall become effective as of 12:01 a.m. on** 09/09/2008

**NEW YORK CHANGES –
PROFESSIONAL LIABILITY POLICY**



<u>**Management and Professional Liability**</u>

2.  Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this **Policy** to the extent of the insurance afforded by this **Policy**. If a judgment entered against an **Insured** remains unsatisfied after the expiration of thirty (30) days from the service of notice of entry of the judgment upon the attorney for the **Insured** and upon the Insurer, then an action may, except during a stay or limited stay of execution against the **Insured** on such judgment be maintained against the Insurer, under the terms of the **Policy** for the amount of such judgment to the extent of the insurance provided by this **Policy**.

3.  No person or organization shall have any right under this **Policy** to join the Insurer as a party to any **Claim** against the **Insured** nor shall the Insurer be impleaded by the **Insureds** or their legal representatives in any such **Claim**.

_____

Authorized Representative of

_____

Date

<u>All other terms of your policy remain the same.</u>

<u>**To be attached to**</u>
**Policy No.:** 474-00-06-11-0000
**Insured:** PARK AVENUE BANCORP, INC.

<u>**This endorsement shall become effective
as of 12:01 a.m. on**</u> 09/09/2008

**NEW YORK AMENDATORY**
**ENDORSEMENT – REGULATION 110**



<u>**Management and Professional Liability**</u>

---

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

It is agreed that the following is added to Section V. of this **Policy**:

Y. <u>COINSURANCE AND INDIVIDUAL DEDUC-TIBLES</u>

1. Notwithstanding any provision to the contrary in the **Policy**, if an **Insured** is a corporation and a **Claim** is made against the directors and officers thereof who are **Insured Persons** under this **Policy**, then the **Policy** is amended as follows:

   (A) A Deductible in the amount set forth in the table below shall apply per **Insured Person** with regard to the first one million dollars ($1,000,000) of net **Loss** (excess of the applicable Retention) for each **Claim** falling within Insuring Agreement A. Insured Persons Liability. The total of the individual Deductible amounts to be applied to all such **Insured Persons** in connection with a **Claim** under Insuring Agreement A. Insured Persons Liability shall not exceed the aggregate amount set forth in the table below. In the event that the total individual Deductible amounts for all directors and

officers who are **Insured Persons** exceeds the applicable aggregate Deductible, then the individual Deductible chargeable to each such **Insured Person** shall be the applicable aggregate Deductible divided by the total, but the individual Deductible amount shall in no event be reduced below seventy-five percent (75%) of the applicable individual Deductible set forth in the table below.

   (B) The directors and officers who are **Insured Persons** shall bear at their own risk that percen-tage stated in part the table below of the net **Loss** (excess of the applicable Retention) for the first one million dollars ($1,000,000) of such net **Loss** in excess of the Deductible. The Insurer shall pay the remainder of such net **Loss** for the first one million dollars ($1,000,000) in excess of the Deductible, and any amount of **Loss** in excess thereto, subject to the applicable Limit of Liability.

   (C) The Deductible and Coinsurance provisions in the table below do not apply if the directors and officers who are **Insured Persons** may be indemnified by the **Insured** under Business Corporation Law article 7, Non-Profit Corporation Law article 7 or Banking Law title 7, where the **Policy** is issued directly to such **Insured Persons**, or where the **Policy** is issued to a foreign corpor-ation that is exempt under Business Corporation law section 1320 or Non-Profit Corporation Law section 727.

| Size of Corporation | Deductible Amounts Individual/Aggregate | Coinsurance Percentage |
|---|---|---|
| Assets greater than $20,000,000 | $5,000/$50,000 | 0.5% |
| Assets greater than $10,000,000 up to $20,000,000 | $4,000/$40,000 | 0.4% |
| Assets greater than $5,000,000 up to $10,000,000 | $3,000/$30,000 | 0.3% |
| Assets of $5,000,000 or less | $2,000/$20,000 | 0.2% |

<u>All other terms of your policy remain the same.</u>

<u>**To be attached to**</u>
Policy No.: 474-00-06-11-0000
Insured: PARK AVENUE BANCORP, INC.

<u>**This endorsement shall become effective as of 12:01 a.m. on**</u> 09/09/2008

# POLICY CHANGE 1

Effective 09/09/2008 , this endorsement forms a part of Policy No. 474-00-06-11-0000
(At the time stated in the policy)

issued to

PARK AVENUE BANCORP, INC.

Producer: S.H. SMITH AND COMPANY, INC.

by OneBeacon Midwest Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**Specific Event Exclusion**

It is agreed that the following exclusion is added to Section IV. of this **Policy**:

**Specific Event** — The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** arising out of or in any way involving:

Prior litigation regarding approximately $5,000,000 in loans sold to Signature Bank; or involving the NY State Department of Banking mandate for the prior owner's shares to be divested by June 2009.

This exclusion applies to
All Insuring Agreements.

3 4-63-0001 09/16/2008  L1B CPW PR 0.997

All other terms of your policy remain the same.

ASC 00 10 MPL10 01 98                    ARCHIVE                    Page 1 of 1

POLICY NUMBER: 474-00-06-11-0000

The following forms were sent to you with your policy, but they are not part of your policy.  They contain information which you may find useful about your policy, insurance in general, your premium payments, or other topics of interest.  These forms do not give you insurance coverage.  Refer to the forms that are part of your policy to determine if a loss is covered, and what we will pay, as well as your rights and duties.

SCB 014 01 06          NY NOTICE - ADDENDUM TO APPLICATION & 
                       DECLARATION

3 4-63-0001 09/16/2008  L1B CPW PR 0.997

**Professional @vantage**
for Financial Institutions

**Financial Institution Bond**

OneBeacon America Insurance Company
Herein referred to as "Underwriter"



# Declarations

| Bond Number: | 474-00-06-12-0000 |
|---|---|

| Item 1: | Name of Insured: | PARK AVENUE BANCORP, INC. |
|---|---|---|
| | Principal Address: | FL 13 |
| | | 460 PARK AVE FL 13 |
| | | NEW YORK, NY 10022-1906 |

**Item 2:** This Bond is to be effective from 12:01 a.m. on 09/09/2008 and expires 12:01 a.m. on 09/08/2009 standard time at the Principal Address as to each of said dates.

**Item 3:** Bond Premium: $29,570.

**Item 4:** Offices or Premises Covered: All of the Insured's offices or Premises in existence at the time this Bond becomes effective are covered under this Bond.

**Item 5:** No coverage is provided under any Insuring Agreement unless so indicated in the Table of Single Loss Limits of Indemnity and Deductible Amounts showing the Underwriter's Single Loss Limit(s) of Indemnity or in any endorsement hereafter agreed upon. The Underwriter's Single Loss Limit of Indemnity and Deductible for Each and Every Loss under each Insuring Agreement as shown on the Table of Single Loss Limits of Indemnity and Deductible Amount are subject to these Declarations, Additional Benefits, Definitions, Exclusions, and General Agreements and Conditions of this Bond and the terms and limitations of the Insuring Agreement having reference thereto and any endorsement(s) to this Bond.

**Item 6:** Employee Benefit Plan(s) covered by this Bond include any employee welfare or pension benefit plan that qualifies under Section 412 of the Employee Retirement Income Security Act of 1974 which is owned, controlled or operated solely by the Insured or jointly by the Insured for the benefit of the Employees of the Insured shown in Item 1, but only as respect to the coverage of Insuring Agreement (Q).

**Item 7:** This Bond is subject to the terms of the following endorsement(s) attached hereto at the effective date of this Bond
    See ASC 00 11 01 98, Schedule 1

and to all other endorsements attached hereto after the effective date of this Bond.

**Item 8:** The Insured, by acceptance of this Bond, gives notice to the Underwriter terminating or canceling prior Bond(s) No.(s)

such termination or cancellation to be effective as of the time this Bond becomes effective.

**Item 9:** Dated: 09/16/2008

IN WITNESS WHEREOF, the Underwriter has caused this Bond to be signed by its President and Secretary of the Underwriter.

_Dennis R. Smith_
Secretary

_Mike Mice_
President

3 4-63-0001 09/16/2008   L1B CPW PR 0.997

**Professional @vantage**
for Financial Institutions

Financial Institution Bond

# TABLE OF SINGLE LOSS LIMITS OF
# INDEMNITY AND DEDUCTIBLE AMOUNTS

Bond Number: 474-00-06-12-0000

| INSURING AGREEMENTS | | SINGLE LOSS LIMIT OF INDEMNITY | DEDUCTIBLE EACH AND EVERY LOSS |
|---|---|---|---|
| (A) | EMPLOYEE DISHONESTY | $3,000,000 | $75,000 |
| (B) | LOSS INSIDE THE PREMISES | $3,000,000 | $75,000 |
| (C) | LOSS WHILE IN TRANSIT | $3,000,000 | $75,000 |
| (D) | FORGERY, COUNTERFEIT, ALTERATION AND FRAUDULENT INSTRUCTIONS<br>Unauthorized Signature Coverage ☒ Included ☐ Excluded | $3,000,000 | $75,000 |
| (E) | FORGERY AND ALTERATION OF SECURITIES AND OTHER INSTRUMENTS<br>Loan Participation Coverage ☒ Included ☐ Excluded | $3,000,000 | $75,000 |
| (F) | COUNTERFEIT MONEY | $3,000,000 | $75,000 |
| (G) | FRAUDULENT MORTGAGES – DEFECTIVE SIGNATURES | $3,000,000 | $75,000 |
| (H) | STOP PAYMENT ORDERS OR WRONGFUL DISHONOR OF CHECKS LEGAL LIABILITY | $250,000 | $2,500 |
| (I) | TRANSIT CASH LETTERS | $1,000,000 | $0 |
| (J) | AUTOMATED TELLER MACHINES | $200,000 | $10,000 |
| (K) | ELECTRONIC / COMPUTER SYSTEMS FRAUD<br>Telefacsimile, Email and Voice Instruction Transaction Coverage: ☒ Included ☐ Excluded<br>Electronic Notes Fraud Coverage ☒ Included ☐ Excluded<br>Remote Access Voice Computer System (PBX) Telephone Fraud Coverage ☒ Included ☐ Excluded | $3,000,000 | $75,000 |
| (L) | RESTORATION COSTS OF ELECTRONIC INFORMATION | $1,000,000 | $75,000 |
| (M) | SAFE DEPOSIT BOX<br>(M)(1) Legal Liability of Depository<br>(M)(2) Loss of Customers' Property [Money: ☒ Included ☐ Excluded] | $1,000,000 | $0 |
| (N) | KIDNAP & EXTORTION INCLUDING CYBER EXTORTION THREATS | $3,000,000 | $0 |
| (O) | CHECK KITING FRAUD | $250,000 | $30,000 |
| (P) | SERVICING CONTRACTORS | $1,000,000 | $75,000 |
| (Q) | EMPLOYEE BENEFIT PLAN(S) | $3,000,000 | $0 |
| (R) | CLAIMS AND AUDIT EXPENSE | $100,000 | $0 |

# POLICY CHANGE 1

Effective 09/09/2008 , this endorsement forms a part of Policy No. 474-00-06-11-0000
(At the time stated in the policy)

issued to

PARK AVENUE BANCORP, INC.

Producer: S.H. SMITH AND COMPANY, INC.

by OneBeacon Midwest Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### Specific Event Exclusion

It is agreed that the following exclusion is added to
Section IV. of this Policy:

**Specific Event —** The Insurer shall not be liable to
make any payment for **Loss** in connection with any
**Claim** arising out of or in any way involving:

Prior litigation regarding approximately $5,000,000 in loans
sold to Signature Bank; or involving the NY State Department of
Banking mandate for the prior owner's shares to be divested by June
2009.

This exclusion applies to
All Insuring Agreements.

3 4-63-0001 09/16/2008   L1B CPW PR 0.997

All other terms of your policy remain the same.

ASC 00.10 MPL10 01 98                    PRODUCER                              Page 1 of 1

**POLICY NUMBER:** 474-00-06-11-0000

**Non-Policy Forms**

The following forms were sent to you with your policy, but they are not part of your policy. They contain information which you may find useful about your policy, insurance in general, your premium payments, or other topics of interest. These forms do not give you insurance coverage. Refer to the forms that are part of your policy to determine if a loss is covered, and what we will pay, as well as your rights and duties.

SCB 014 01 06          NY NOTICE - ADDENDUM TO APPLICATION &
                       DECLARATION

3 4-63-0001 09/16/2008  L1B CPW PR 0.997

Copyright 1998, OneBeacon Insurance Group
PRODUCER

# SCHEDULE 1

Effective 09/09/2008 , this schedule forms a part of Policy No. 474-00-06-12-0000
(At the time stated in the policy)
Issued to:

PARK AVENUE BANCORP, INC..


Producer: S.H. SMITH AND COMPANY, INC.

by OneBeacon America Insurance Company

Declarations, SCB 101 01 06, Continued

Forms Applicable to the Professional Liability Coverage Part:

| | |
|---|---|
| SCB 001 01 06 | FINANCIAL INSTITUTION BOND COVERAGE FORM |
| SCB 101 01 06 | FINANCIAL INSTITUTION BOND DECLARATIONS |
| SCB 317 01 06 | NAME OF INSURED ENDORSEMENT |
| SCB 620 05 07 | NEW YORK STATUTORY ENDORSEMENT |
| ASC 00 11 01 98 | Schedule 1 - LIST OF COMMUNITY BANKS FORMS |

# Professional @vantage
### for Financial Institutions

## Financial Institution Bond

I.  INSURING AGREEMENTS ...................................................................................................2
    (A)  EMPLOYEE DISHONESTY ........................................................................................2
    (B)  LOSS INSIDE THE PREMISES .................................................................................2
    (C)  LOSS WHILE IN TRANSIT .......................................................................................3
    (D)  FORGERY, COUNTERFEIT, ALTERATION AND FRAUDULENT INSTRUCTIONS .....3
         Unauthorized Signature Coverage.............................................................................4
    (E)  FORGERY AND ALTERATION OF SECURITIES AND OTHER INSTRUMENTS .........4
    (F)  COUNTERFEIT MONEY ..........................................................................................4
    (G)  FRAUDULENT MORTGAGES – DEFECTIVE SIGNATURES ....................................4
    (H)  STOP PAYMENT ORDERS OR WRONGFUL DISHONOR OF CHECKS LEGAL LIABILITY .....5
    (I)  TRANSIT CASH LETTERS ......................................................................................5
    (J)  AUTOMATED TELLER MACHINES ..........................................................................5
    (K)  ELECTRONIC / COMPUTER SYSTEMS FRAUD ......................................................6
         Telefacsimile, Email and Voice Instruction Transactions Coverage .........................6
         Electronic Notes Fraud Coverage .............................................................................7
         Remote Access Voice Computer System (PBX) Telephone Fraud Coverage ...........7
    (L)  RESTORATION COSTS OF ELECTRONIC INFORMATION .......................................7
    (M)  SAFE DEPOSIT BOX ..............................................................................................8
    (N)  KIDNAP & EXTORTION INCLUDING CYBER EXTORTION THREATS .......................8
    (O)  CHECK KITING FRAUD ...........................................................................................9
    (P)  SERVICING CONTRACTORS ..................................................................................10
    (Q)  EMPLOYEE BENEFIT PLAN(S) ...............................................................................10
    (R)  CLAIMS AND AUDIT EXPENSE ..............................................................................10
II  ADDITIONAL BENEFITS ...................................................................................................12
    (A)  COURT COSTS AND ATTORNEY'S FEES – NOTICE OF LEGAL PROCEEDINGS AGAINST INSURED –
         ELECTION TO DEFEND ..........................................................................................12
    (B)  INDEMNITY FOR INJURY OR DEATH OF DIRECTORS OR EMPLOYEES ...............12
    (C)  REIMBURSEMENT FOR REWARD PAYMENTS .......................................................12
III.  DEFINITIONS .................................................................................................................13
IV.  EXCLUSIONS .................................................................................................................19
V.  GENERAL AGREEMENTS AND CONDITIONS ...................................................................23
    (A)  ADDITIONAL OFFICES OR EMPLOYEES – CONSOLIDATION, MERGER OR PURCHASE OF ASSETS -
         NOTICE ..................................................................................................................23
    (B)  CHANGE OF OWNERSHIP - NOTICE .....................................................................23
    (C)  TERMINATION OR CANCELLATION ........................................................................23
    (D)  DISCOVERY ...........................................................................................................24
    (E)  RIGHTS TO PURCHASE DISCOVERY PERIOD .......................................................25
    (F)  LIMIT OF INDEMNITY - SERIES OF LOSSES - NON ACCUMULATION OF LIABILITY .....25
    (G)  LIMIT OF LIABILITY UNDER THIS BOND AND PRIOR INSURANCE ........................26
    (H)  DEDUCTIBLE AMOUNT ..........................................................................................26
    (I)  NOTICE/PROOF – LEGAL PROCEEDINGS AGAINST UNDERWRITER ...................26
    (J)  VALUATION ............................................................................................................28
    (K)  ASSIGNMENT-SUBROGATION-RECOVERY-APPLICATION OF RECOVERIES .........27
    (L)  COOPERATION .......................................................................................................28
    (M)  JOINT INSURED .....................................................................................................28
    (N)  JOINT LOSS PAYEES .............................................................................................28
    (O)  COVERED PROPERTY ............................................................................................28
    (P)  ANTI-BUNDLING .....................................................................................................28
    (Q)  NOMINEES .............................................................................................................28
    (R)  OTHER INSURANCE OR INDEMNITY .....................................................................29
    (S)  REPRESENTATION OF INSURED ...........................................................................29
    (T)  LIBERALIZATION ....................................................................................................29
    (U)  TITLES OF PARAGRAPHS ......................................................................................29

INSURED

# Professional @vantage
for Financial Institutions

**Financial Institution Bond**                  **I. Insuring Agreements**

The Underwriter, in consideration of an agreed premium and subject to the Declarations, Table of Single Loss Limits of Indemnity and Deductible Amounts, Insuring Agreements, Additional Benefits, Definitions, Exclusions, and General Agreements and Conditions, any endorsement(s) and all other terms hereof, agrees to indemnify the Insured for:

## (A)  EMPLOYEE DISHONESTY

Loss resulting directly from dishonest or fraudulent acts committed by an **Employee** acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the **Employee** with the intent:

    (a) to cause the **Insured** to sustain such loss; or

    (b) to obtain financial benefit for the **Employee** or another person or entity.

However, if some or all of the **Insured's** loss results directly or indirectly from **Loans**, that portion of the loss is not covered unless the **Employee**:

    (i) acted with the intent to cause the **Insured** to sustain such a loss;

    (ii) was in collusion with one or more parties to the transaction; and

    (iii) has received, in connection therewith, an improper financial benefit.

Additionally, if some or all of the **Insured's** loss results directly or indirectly from trading, that portion of the loss is not covered unless the **Employee**:

    (i) acted with the intent to cause the **Insured** to sustain such a loss; and

    (ii) has received, in connection therewith, an improper financial benefit.

Provided, however, that in the case of loss resulting from such **Loans** or trading, where such **Employee** fails to receive an improper financial benefit, such loss nevertheless will be covered hereunder as if the **Employee** had received such benefit if:

    (i) other persons with whom the **Employee** was dishonestly or fraudulently acting in collusion received proceeds from the **Loan** or trading; and

    (ii) the **Insured** establishes that the **Employee** intended to share or participate in the proceeds of the **Loan** or trading.

As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions. Payments, which the **Employee** receives directly and solely as a result of a fraudulent or dishonest scheme and which are not part of the compensation that the Insured has agreed to pay the **Employee**, will not be considered an employee benefit earned in the normal course of employment.

## (B)  LOSS INSIDE THE PREMISES

(1)  Loss of **Property** resulting directly from robbery, burglary, misplacement, mysterious unexplainable disappearance and damage thereto or destruction thereof; or theft, false pretenses, common-law or statutory larceny, committed by a person present in an office or on the **Premises of the Insured**; while the **Property** is lodged or deposited within offices or **Premises** located anywhere.

The premises of the Depository Trust Company of New York shall be deemed **Premises of the Insured**, but solely as respects loss of **Certificated Securities. Certificated Securities** held by such depository shall be deemed to be **Property** for purposes of this Insuring Agreement to the extent of the **Insured's** interest therein as effected by the making of appropriate entries on the books and records of such depository.

(2)  Loss, through any hazard specified in this Insuring Agreement, of any of the items enumerated in the paragraph defining **Property**:

    (a) while such items are within any of the **Insured's** offices or **Premises** and in the possession of any customer of the **Insured**, any representative of such customer or an **Employee of the Insured**; or

    (b) through robbery or hold-up while such customer or representative is actually transacting business with the **Insured** at an outside window or other similar facility offered to the public and attended by an **Employee of the Insured**, at any of the **Insured's** offices or **Premises** covered hereunder; or

    (c) through robbery or hold-up during banking hours while such customer, representative or **Employee** is in any building or on any driveway,

# Professional @vantage
## for Financial Institutions

### Financial Institution Bond

parking lot or similar facility maintained by the **Insured** as a convenience for such customers or representatives using motor vehicles, if such customer, representative or **Employee** is present in such building or on such facility for the purpose of transacting banking business with the **Insured** at any of the **Insured's** offices or **Premises** covered hereunder;

whether or not the **Insured** is liable for the loss thereof, and provided such loss, at the option of the **Insured**, is included in the proof of loss, but excluding, in any event, loss caused by such customer, any representative of such customer or **Employee**.

(3) Loss of or damage to:

(a) furnishings, fixtures, supplies or equipment within an office or **Premise** of the **Insured** covered under this Bond resulting directly from larceny or theft in, or by hold-up, burglary or robbery of such office or **Premise** or attempt thereat;

(b) such office or **Premise**, or to the interior of such office or **Premise** resulting from larceny or theft in, or by holdup, burglary or robbery of such office or **Premise** or attempt thereat; or

(c) any of the **Insured's** buildings in which the **Insured's** offices or **Premises** or branches are located, caused by larceny, theft, hold-up, burglary, robbery or attempt thereat;

Provided that the **Insured** is the owner of such furnishings, fixtures, supplies, equipment, office, **Premise** or building or is liable for such loss or damage and the loss is not caused by fire.

(C) LOSS WHILE IN TRANSIT

Loss of **Property** resulting directly from robbery, common-law or statutory larceny, theft, misplacement, mysterious unexplainable disappearance, being lost or made away with, and damage thereto or destruction thereof, while the **Property** is in transit anywhere in the custody of:

(a) a natural person acting as a messenger of the **Insured** (or another natural person acting as messenger or custodian during an emergency arising from the incapacity of the original messenger);

(b) a **Transportation Company** and being transported in an armored motor vehicle; or

(c) a **Transportation Company** and being physically transported in a conveyance other than an armored motor vehicle, provided that covered **Property** transported in such manner is limited to the following:

(i) records, whether recorded in **Writing** or electronically;

(ii) **Certificated Securities** issued in registered form and not endorsed, or with restrictive endorsements;

(iii) **Negotiable Instruments** not payable to bearer, not endorsed, or with restrictive endorsements; and

(iv) mortgage notes in which the Federal Home Loan Mortgage Association has an interest.

Coverage under this Insuring Agreement begins immediately upon the receipt of such **Property** by the natural person or **Transportation Company** and ends immediately upon delivery to the designated recipient or its agent.

(D) FORGERY, COUNTERFEIT, ALTERATION AND FRAUDULENT INSTRUCTIONS

Loss resulting directly from:

(1) Forgery, counterfeiting or alteration of, on, or in, any **Negotiable Instrument** (except an **Evidence of Debt** or **Substitute Check**), **Acceptance**, **Withdrawal Order**, **Written** receipt for the withdrawal of **Property**, **Certificate of Deposit** or **Letter of Credit**; or

(2) transferring, paying or delivering any funds or **Property** or establishing any credit or giving any value on the faith of any **Written** instructions or advices directed to the **Insured** and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or **Property**, which instructions or advices purport to have been signed or endorsed by any customer of the **Insured** or by any banking institution, but which instructions or advices either bear a signature which is a **Forgery** or have been altered without the knowledge and consent of such customer or banking institution; or

(3) transferring, paying or delivering any funds or **Property** in good faith reliance upon any **Substitute Check** that bears a copy of a handwritten signature of any maker or drawer which is a **Forgery**.

# Professional @vantage
for Financial Institutions

## Financial Institution Bond

## I. Insuring Agreements

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer is treated the same as the handwritten signature. Any other Electronic Signature, however, is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement.

### Unauthorized Signature Coverage

Loss resulting directly from accepting or paying or cashing any **Negotiable Instruments** or **Withdrawal Orders**, which bear unauthorized signatures or endorsements, shall be deemed to be a **Forgery** if Unauthorized Signature Coverage is indicated as included under Insuring Agreement (D) in the Table of Single Loss Limits of Indemnity and Deductible Amounts on this Bond.

It shall be a condition precedent to the **Insured's** right of recovery for loss under Unauthorized Signature Coverage, that the **Insured** shall have on file signatures of all persons authorized to sign such **Negotiable Instruments** or **Withdrawal Orders**. For purposes of the coverage provided under Unauthorized Signature Coverage the definition of **Forgery** contained in the Definitions section of this Bond does not apply.

### (E)  FORGERY AND ALTERATION OF SECURITIES AND OTHER INSTRUMENTS

Loss resulting directly from the **Insured** having, in good faith, for its own account or for the account of others:

(1)  acquired, sold, delivered, or given value, extended credit or assumed liability, on the faith of any original **Written** document that is a:
   (a)  **Certificated Security**;
   (b)  **Document of Title**;
   (c)  deed, mortgage or other instrument conveying title to, or creating or discharging a lien on, real property;
   (d)  **Certificate of Origin or Title**;
   (e)  **Evidence of Debt**;
   (f)  corporate, partnership or personal **Guarantee**;
   (g)  **Security Agreement**;
   (h)  **Written Instruction**;

(i)  **Statement of Uncertificated Security**; which
   (i)  bears a handwritten signature of any maker, drawer, issuer, endorser, assignor, lessee, transfer agent, registrar, acceptor, surety, guarantor, or of any person signing in any other capacity, that is a **Forgery**;
   (ii)  is altered; or
   (iii)  is lost or stolen;

(2)  guaranteed in **Writing** or witnessed any handwritten signature upon any transfer, assignment, bill of sale, power of attorney, **Guarantee**, endorsement or any items listed in (1)(a) through (1)(h) above;

(3)  acquired, sold or delivered, or given value, extended credit or assumed liability, on the faith of any item listed in (1)(a) through (1)(d) above, which is a **Counterfeit**.

Actual physical possession of the items listed in (1)(a) through (1)(i) above by the **Insured** is a condition precedent to the **Insured's** having relied on the faith of such items. Actual physical possession of the items listed in (1)(a) through (1)(i) above by a correspondent bank or other representative authorized to possess such items on behalf of the **Insured**, shall satisfy the actual physical possession requirement if Loan Participation Coverage is indicated as included under Insuring Agreement (E) in the Table of Single Loss Limits of Indemnity and Deductible Amounts.

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a computer printer is treated the same as the handwritten signature. Any other **Electronic Signature**, however, is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement.

### (F)  COUNTERFEIT MONEY

Loss resulting directly from the receipt by the **Insured**, in good faith, of any **Counterfeit** or altered **Money** issued or purported to have been issued by any lawful government.

### (G)  FRAUDULENT MORTGAGES – DEFECTIVE SIGNATURES

Loss resulting directly from the **Insured** having, in good faith and in the course of business in connection with any **Loan**, accepted or received or acted upon the faith of any real property mortgages, real property deeds of trust or like instruments pertaining to realty or assignments of such mortgages, deeds of trust or instruments which

# Professional @vantage
for Financial Institutions

## Financial Institution Bond

prove to have been defective by reason of the signature thereon of any person having been obtained through trick, artifice, fraud or false pretenses or the signature on the recorded deed conveying such real property to the mortgagor or grantor of such mortgage or deed of trust having been obtained by or on behalf of such mortgagor or grantor through trick, artifice, fraud or false pretenses.

**(H) STOP PAYMENT ORDERS OR WRONG-FUL DISHONOR OF CHECKS LEGAL LIABILITY**

Damages for which the **Insured** shall become legally liable resulting directly from the **Insured** having:

(1) failed to comply with any notice of any customer of the **Insured** or any authorized representative of such customer to stop payment on any check or draft made or drawn by such customer; or

(2) wrongfully dishonored or wrongfully failed to certify any check or draft made or drawn by the customer of the **Insured** or any authorized representative of such customer.

Notwithstanding any other provision of this Bond, damages under part (2) above shall not include the amount of any check(s) or draft(s) in question, nor any amounts paid to the payee, endorser or accommodation party of such check(s) or draft(s).

**(I) TRANSIT CASH LETTERS**

(1) Loss of any item(s) enclosed in a **Transit Cash Letter**, (which item(s) shall have been lost or missing for at least 20 days after the **Insured** learns that the same has not arrived at its destination), while in transit during the course of collection, presentation or payment, between any office or **Premise** of the **Insured** and any place in the United States of America or Canada;

(2) loss of any canceled check(s) drawn by a customer after such check(s) has been charged to the customer's account and after a statement of the condition of that account purporting to enclose such check(s) has been delivered or dispatched to the customer;

(3) the payment of overtime wages paid to regular **Employees** of the **Insured**, and/or wages paid to extra **Employees** engaged in identifying the depositors of the lost items and/or assisting depositors in obtaining duplicates thereof and the necessary costs incurred for the use of mechanical devices and materials in obtaining duplicates of the **Transit Cash Letter** item(s) where such devices and materials are not owned by the **Insured**; or

(4) loss of any checks, promissory notes, drafts or similar items sent by the **Insured** to an **Electronic Data Processor** while such items are in transit either from the **Insured** to the **Electronic Data Processor** or from the **Electronic Data Processor** to the **Insured**; or such items between offices or **Premises** of the **Insured**.

It shall be a condition precedent to recovery under this Insuring Agreement that the **Insured** shall:

(a) To the best of its ability take and retain a photograph or digital image of the front (face) of each item bearing not more than one endorsement and the front (face) and the back of each item bearing more than one endorsement; or

(b) Make a record of the name of the issuer, drawer or maker of each check, promissory note, draft or similar item(s) with all other descriptive data necessary for the purpose of reconstruction.

Nothing, however, in this paragraph shall bar the **Insured** from recovery where no photograph or digital image is available because of the mechanical failure of the device used in making such photographic or digital image, failure of the film or digital imaging system to reveal the image, damage or destruction to film (developed or undeveloped) from any cause, or error or omission of any **Employees** of the **Insured** in operating microfilming, digital imaging or similar equipment. This condition shall not apply to checks enclosed with customers' statements.

**(J) AUTOMATED TELLER MACHINES**

Loss of **Property** while such **Property** is located within any **Automated Teller Machines** caused by burglary, damage to or destruction of the **Property** and for the damage to or destruction of such **Automated Teller Machines** caused by burglary or attempt thereat, provided, however, that this Insuring Agreement does not cover loss:

(a) to such **Automated Teller Machines** or to that portion of a building or any **Premises** where such **Automated Teller Machines** are located, resulting from vandalism or malicious mischief; or

# Professional @vantage
for Financial Institutions

**Financial Institution Bond** _____ **I. Insuring Agreements**

(b) to any customer of the Insured or to any representative of such customer while such person is on any premises containing an **Automated Teller Machine**, unless such person is transacting business at the **Automated Teller Machines** covered hereunder and the loss is caused by robbery.

## (K) ELECTRONIC / COMPUTER SYSTEMS FRAUD

Loss resulting directly from an intentional, unauthorized and fraudulent entry of or change of **Electronic Data** or **Computer Programs** within any **Computer System**, including a **Computer Virus** or such entries or changes made via the Internet; provided that the entry or change causes:

(1) Property or Uncertificated Securities to be transferred, paid or delivered;

(2) An account of the **Insured**, or of its customer, to be added, deleted, debited or credited; or

(3) An unauthorized account or a fictitious account to be debited or credited.

In this Insuring Agreement, intentional, unauthorized and fraudulent entry or change shall include such entry or change made by an **Employee** of the **Insured** acting in good faith and in reliance upon:

(a) an instruction from a software contractor who has a **Written** agreement with the **Insured** to design, implement or service programs for a **Computer System** covered by this Insuring Agreement;

(b) an instruction transmitted by **Tested** telex or similar means of **Tested** communication (except a **Telefacsimile Device**) purportedly sent by a customer, financial institution or automated clearing house;

Loss shall mean all covered costs incurred by the **Insured** between the time destruction or damage is discovered and the time the **Computer System** is restored to substantially the previous level of operational capability. Recurrence of destruction or damage after the **Computer System** is restored shall constitute a separate **Single Loss**.

### Telefacsimile, Email and Voice Instruction Transactions Coverage

If Telefacsimile, Email and Voice Instruction Transactions Coverage is indicated as included under Insuring Agreement (K) in the Table of Single Loss Limits of Indemnity and Deductible Amounts of this Bond:

Loss resulting directly from having in good faith:

(1) transferred funds on deposit in a **Customer's** account, **Certificated Securities** or **Uncertificated Securities** in reliance upon a fraudulent **Telefacsimile Device** instruction directed to the **Insured**, which purports and reasonably appears to be from a **Customer** of the **Insured**, another financial institution; or another office or **Premise** of the **Insured**; but, in fact was not originated by the **Customer**, another financial institution or another office or **Premise** of the **Insured** and purports and reasonably appears to contain the handwritten signature of a person authorized to initiate such transfer, or a valid test code, that proves to have been used by an unauthorized person;

(2) transferred funds on deposit in a **Customer's** account, **Certificated Securities** or **Uncertificated Securities** in reliance upon a fraudulent instruction received through an email directed to the **Insured**, which purports and reasonably appears to be from a **Customer** of the **Insured**, another financial institution; or another office or **Premise** of the **Insured**; but, in fact was not originated by the **Customer**, another financial institution or another office or **Premise** of the **Insured** and purports and reasonably appears to have been originated by the **Customer** or entity whose identification it bears and contains the name of a person authorized to initiate such transfer, that proves to have been used by an unauthorized person; or

(3) transferred funds on deposit in a **Customer's** account in reliance upon a fraudulent telephonic voice instruction transmitted to the **Insured** which purports to be from:

(a) an officer, director, partner or employee of a **Customer** of the **Insured**, who is authorized by the **Customer** to instruct the **Insured** to make such a transfer;

(b) an individual person who is a **Customer** of the **Insured**; or

(c) an **Employee** of the **Insured**, in another office or **Premise** of the **Insured**, who was authorized by the **Insured** to instruct other **Employees** of the **Insured** to transfer funds on deposit in a **Customer's** account, and was received by an **Employee** of the **Insured** specifically designated to receive and act upon such instructions;

but the telephonic voice instruction was not from a person described in this part (3).

# Professional @vantage
## for Financial Institutions

**Financial Institution Bond**                                    **I. Insuring Agreements**

Provided that with regard to Telefacsimile, Email and Voice Instruction Transactions Coverage:

(a) if the transfer was in excess of the Deductible Each and Every Loss for Insuring Agreement (K) as set forth on the Table of Single Loss Limits of Indemnity and Deductible Amounts of this Bond, the instruction was verified by a call back or other Electronic verification according to a prearranged procedure; and

(b) if the instruction purports to be from a Customer of the Insured, the term "Customer" within Telefacsimile, Email and Voice Instruction Transactions Coverage means an entity or natural person which has a Written agreement with the Insured authorizing the Insured to rely on voice instructions or instructions received via email to make transfers and which has provided the Insured with the names of persons authorized to initiate such transfers and with which the Insured has established an instruction verification mechanism.

### Electronic Notes Fraud Coverage

If Electronic Notes Fraud Coverage is indicated as included under Insuring Agreement (K) in the Table of Single Loss Limits of Indemnity and Deductible Amounts on this Bond:

Loss resulting directly from the Insured having, in good faith, for its own account or for the account of others acquired, sold, delivered, or given value, extended credit or assumed liability, on the faith of any Electronic Note originated by the Insured which:

(1) contains the unauthorized use of a Digital Signature of a party to such Electronic Note with the intent to deceive; or

(2) the Authoritative Copy of which has been altered.

As a condition precedent to coverage provided by Electronic Notes Fraud Coverage:

(a) the Digital Signature shall be signed using a Certificate-based Public Key Cryptography system, the rules of which are governed by a commercially recognized Policy Management Authority, using a Certificate issued by a Certification Authority;

(b) before issuing the Certificate, a representative of the Certification Authority or a duly authorized registration authority must confirm the identity of the applicant in person with two forms of State or Federally issued identification; and

(c) the Insured must have control of any Electronic Note that bears a Digital Signature in order for the Insured to have relied on the faith of the Electronic Note. Control is established if the Insured is identified as the person in control of the Electronic Note in accordance with the requirements of Section 201(c) of the federal Electronic Signatures in Global and National Commerce Act.

### Remote Access Voice Computer System (PBX) Telephone Fraud Coverage

If Remote Access Voice Computer System (PBX) Telephone Fraud Coverage is indicated as included under Insuring Agreement (K) in the Table of Single Loss Limits of Indemnity and Deductible Amounts on this Bond:

Loss resulting directly from charges for voice telephone long-distance toll calls which were incurred due to the fraudulent use or fraudulent manipulation of an Account Code or System Password required to obtain access to a Voice Computer System first used by the Insured, installed on the Insured's Premises, whose System Administration is performed and controlled by the Insured; provided, however, that the unauthorized access was not made possible by:

(1) failure to incorporate a System Password feature or failure to change the System Password at least once every thirty (30) days thereafter; or

(2) failure to have a call-disconnect feature in operation to automatically terminate a caller's access to the Voice Computer System after not more than three unsuccessful attempts to input an Account Code.

### (L) RESTORATION COSTS OF ELECTRONIC INFORMATION

(1) Reasonable expenses incurred and/or fees paid by the Insured, for the:

(a) cost of computer time, computer programmers, consultants or other technical specialists as is reasonably necessary to verify and substantially restore Computer Programs to their previous level of operational capability; and

(b) cost of labor for the actual transcription or copying of Electronic Data from source documents furnished by the Insured in order to reproduce such Electronic Data;

# Professional @vantage
for Financial Institutions

**Financial Institution Bond**                                    **I. Insuring Agreements**

that have been intentionally and fraudulently damaged or destroyed by an **Employee** while stored within the **Insured's Computer** or the **Computer** of its **Electronic Data Processor** or while recorded upon **Electronic Data Processing Media** within the offices or **Premises** of the **Insured**, provided the **Insured** is the owner of the **Electronic Information** or is legally liable for such loss or damage and the **Insured** is unable to reproduce such **Electronic Information** from back-up copies.

(2)   Loss resulting directly from the malicious destruction of, or damage to, **Electronic Data** or **Computer Programs** owned by the **Insured** or for which the **Insured** is legally liable while stored within a **Computer System** covered under the terms of Insuring Agreement (K) above, including damage or destruction caused by a **Computer Program** or similar instruction which was written or altered to incorporate a hidden instruction designed to destroy or damage **Electronic Data** or **Computer Programs** in the **Computer System** in which the **Computer Program** or instruction so written or so altered is used.

The liability of the Underwriter as to this Coverage shall be limited to the cost of duplication and/or replacement of such **Electronic Data** or **Computer Programs**. In the event, however, that destroyed or damaged **Computer Programs** cannot be duplicated from other **Computer Programs**, the Underwriter will pay the cost incurred for computer time, computer programmers, consultants or other technical specialists as is reasonably necessary to restore the **Computer Programs** to substantially the previous level of operational capability.

**Special Conditions and Limitations to Insuring Agreement (L):**

Loss shall mean all covered costs incurred by the **Insured** between the time destruction or damage is discovered and the time the **Computer System** is restored to substantially the previous level of operational capability. Recurrence of destruction or damage after the **Computer System** is restored shall constitute a separate Single Loss.

**(M)  SAFE DEPOSIT BOX**

**Coverage (M)(1) – Legal Liability of Depository**

Sums which the **Insured** shall become legally obligated to pay by reason of liability for loss, damage or destruction of **Money**, bonds, drafts, **Acceptances**, other **Certificated Securities**, valuable papers, valuable documents, jewelry, silverware, and other customer **Property** while in the customers' safe deposit boxes in vaults on the **Premises** or customers' self-service storage boxes on the **Premises**. Such legal liability shall include liability for loss arising from relocation of the **Insured's** safe deposit boxes or customers' self-service storage boxes between offices or **Premises** of the **Insured** or vaults within the same **Premises** of the **Insured**.

**Coverage (M)(2) – Loss of Customers' Property**

Loss of **Money**, if indicated as included under Insuring Agreement (M)(2) in the Table of Single Loss Limits of Indemnity and Deductible Amounts on this Bond thereunder, and other customer **Property** while in the customers' safe deposit boxes in vaults on the **Premises** by burglary or robbery or attempt thereat or for damage to or destruction of such items, provided such loss is included in the **Insured's** Proof of Loss.

Customer **Property** described in this Insuring Agreement shall be covered while stored in such vaults by or for customers, or temporarily elsewhere on the **Insured's Premises** and in the course of deposit in or removal from such boxes or vaults. Such property may be owned by customers or held by them in any capacity, whether or not the customers are liable to others for loss thereof.

**(N)  KIDNAP & EXTORTION INCLUDING CYBER EXTORTION THREATS**

(1)   Loss of **Property** surrendered by the **Insured** or any **Insured Person** as a result of an extortion threat communicated to the **Insured** or an **Insured Person** which occurs anywhere in the world:
   (a)  to abduct or do bodily harm to any **Insured Person** or **Guest** of any **Insured Person** who has or allegedly has been **Kidnapped**;
   (b)  to do damage to the **Premises** or **Property** of the **Insured** or **Insured Person**; or
   (c)  to perpetrate a **Cyber Extortion Threat**;
   by persons who then demand a ransom as a condition of not carrying out such threats.

(2)   Expense incurred by the **Insured** or an **Insured Person** in connection with an extortion threat covered under part (1) of this Insuring Agreement or in connection with a **Hijack** or **Detention** for:

# Professional @vantage
## for Financial Institutions

**Financial Institution Bond**                                                      **I. Insuring Agreements**

(a) investigating an extortion threat;

(b) paying of **Property** as a ransom;

(c) negotiating a release of any **Insured Person**;

(d) paying a reasonable and lawful reward to an **Informant** for information leading to the arrest and conviction of the parties responsible for any loss under this Insuring Agreement;

(e) paying a crisis response firm to resolve the threat or to secure the release of any **Insured Person**, independent public relations consultants and interpreters;

(f) salaries, commissions and other financial benefits paid by the **Insured** to an **Insured Person** at the level in effect on the date of the **Kidnap**, **Detention** or **Hijack** for a period not to exceed five (5) years provided such expense shall cease at the earliest of:

   (i) thirty (30) days following the **Insured Person's** release or the date the **Insured Person** returns to work;

   (ii) discovery of the **Insured Person's** death; or

   (iii) one hundred twenty (120) days after the last credible evidence following abduction that they are still alive;

(g) paying fees for independent psychiatric care, medical care (including costs of cosmetic or plastic surgery required to correct any permanent disfigurement sustained by an **Insured Person**) or legal advice incurred prior to the **Insured Person's** release and within thirty-six (36) months following the **Kidnap**, **Hijack** or **Detention**;

(h) paying personal financial loss of an **Insured Person** because of his or her physical inability to attend to personal financial matters due to a **Kidnap**, **Detention** or **Hijack**; or

(i) paying other reasonable expenses, with consent of the **Underwriter**, that are directly related to the extortion threat.

Indemnification for expenses described in Item (2) above shall be in addition to the applicable Single Loss Limit of Indemnity, provided however, that the amount payable hereunder for expenses incurred with respect to any one loss under this Insuring Agreement shall not exceed fifty percent (50%) of the Single Loss Limit of Indemnity for this Insuring Agreement.

(3) Loss due to destruction, disappearance, or wrongful appropriation of **Property** while being delivered to persons demanding the **Property** by anyone who is authorized by the **Insured** or an **Insured Person** to have custody thereof provided, however, the **Property** being delivered is covered under this Insuring Agreement.

(4) Legal liability of the **Insured** for settlements, awards, fees or judgments imposed upon and paid by the **Insured** as a result of an action for damages brought by or on behalf of any **Insured Person** or such **Insured Person's** legal representative or shareholders solely and directly as a result of a **Kidnap**, **Detention** or extortion threat covered under part (1) of this Insuring Agreement.

As conditions precedent to the Underwriter's liability under this Insuring Agreement:

(a) the extortion threat referred to in (N)(1) above must occur solely and directly as the result of the **Insured Person's** association with the **Insured** and not as the result of such **Insured Person's** association or position with any other entity;

(b) the **Insured** shall have agreed to reimburse any **Insured Person** for such loss of **Property** or expenses and include such in its proof of loss; and

(c) the **Insured** or **Insured Person** shall approve the payment of **Property** prior to the surrender thereof and shall make every reasonable attempt to:

   (i) Determine that the **Kidnap** or extortion threat has actually occurred or determine with reasonable certainty that a **Cyber Extortion Threat** is technologically credible;

   (ii) Give immediate oral or written notice to the **Underwriter**;

   (iii) Notify the Federal Bureau of Investigation or other law enforcement agency having jurisdiction of the demand for **Property** and comply with their recommendations and instructions; and

   (iv) Notify an associate, director or officer of the **Insured**.

(O) **CHECK KITING FRAUD**

Loss resulting directly from checks which are not finally paid because of **Check Kiting Fraud** against the **Insured**.

# Professional @vantage
for Financial Institutions



**Financial Institution Bond**                                      **I. Insuring Agreements**

It shall be a condition precedent to the **Insured's** right of recovery under this Insuring Agreement to stop the payment of any checks drawn on the depositor's account immediately upon discovery of a **Check Kiting Fraud** and return the checks drawn against uncollected funds.

**(P)   SERVICING CONTRACTORS**

(1)  Loss resulting directly from any dishonest or fraudulent act committed by a **Servicing Contractor**, acting alone or in collusion with others, which acts are committed by the **Servicing Contractor** with the intent:

    (a) to cause the **Insured** to sustain such loss; and

    (b) to obtain financial benefit for the **Servicing Contractor** or another person or entity.

As used in this Insuring Agreement, financial benefit does not include any benefits earned in the normal course of employment or performance of the servicing contract, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.

(2)  Loss of **Money** (including obligations of the United States of America) collected or received for the **Insured** by any such **Servicing Contractor** through the failure of such **Servicing Contractor** to pay to the **Insured** the **Money** so collected or received as is discovered to be due and payable while this Insuring Agreement is in force, except, however, **Money** disbursed by such **Servicing Contractor** in accordance with instructions from the **Insured**.

**(Q)   EMPLOYEE BENEFIT PLAN(S)**

Loss resulting directly from any fraudulent or dishonest acts related to an **Employee Benefit Plan** committed by any **Employee** of the **Insured** or any trustee, director, officer or employee of an **Employee Benefit Plan**, including any third party administrator or custodian acting alone or in collusion with others.

In compliance with Title 1 of the Employee Retirement Income Security Act of 1974, payment by the **Underwriter** to the First Named **Insured** shall be held by such **Insured** for the use and benefit of the **Employee Benefit Plan(s)** sustaining such loss. If such payment is in excess of

the amount of coverage required by such Act for said **Employee Benefit Plan(s)**, such excess shall be held for the use and benefit of any other named **Employee Benefit Plan(s)** should such **Employee Benefit Plan(s)** also discover loss recoverable hereunder. If **Money**, securities and other **Property** of two or more **Employee Benefit Plans** are commingled, recovery hereunder for loss of such **Money**, securities and other **Property** shall be shared by such **Employee Benefit Plans** on a pro rata basis in accordance with the amount of coverage each such **Employee Benefit Plan** is required to carry by such Act.

If the Bond covers loss sustained by two or more **Employee Benefit Plans** or sustained by any such **Employee Benefit Plan** in addition to loss sustained by an **Insured** other than such **Employee Benefit Plan**, it is the obligation of the **Insured** or the plan administrator(s) of such **Employee Benefit Plan(s)** under regulations published by the Secretary of Labor implementing Section 13 of the Welfare and Pension Plans Disclosure Act of 1958 to obtain (under one or more bonds issued by one or more insurers) an amount of coverage for each such **Employee Benefit Plan** at least equal to that which would be required if such **Employee Benefit Plans** were bonded separately.

In compliance with the foregoing paragraph, payment by the **Underwriter** in accordance with provisions of the Bond shall be held by the first named **Insured**, for the use and benefit of any **Employee Benefit Plan(s)** sustaining loss so covered. To the extent that such payment is in excess of the amount of coverage required by regulations applicable to said **Employee Benefit Plan(s)** sustaining such loss, such excess shall be held for the use and benefit of any other **Insured Employee Benefit Plan** also covered in the event that such other **Employee Benefit Plan** discovers that it has sustained loss covered under this Bond. If **Money** or other **Property** of two or more **Employee Benefit Plans** covered under this Bond is commingled, recovery for loss of such **Money** or other **Property** through fraudulent or dishonest acts of **Employees** shall be shared by such **Employee Benefit Plans** on a pro rata basis in accordance with the amount of which each **Employee Benefit Plan** is required to carry bonding coverage as specified by said regulations.

**(R)   CLAIMS AND AUDIT EXPENSE**

Reasonable expenses necessarily incurred and paid by the **Insured** in preparing any covered claim for loss under Insuring Agreement (A), which loss exceeds the Deductible Each and Every Loss applicable to Insuring Agreement (A). Such expenses shall include costs incurred for that part of audits or examinations performed, whether or

# Professional @vantage
for Financial Institutions

**Financial Institution Bond**             **I. Insuring Agreements**

not required by State or Federal supervisory authorities and conducted either by such authorities or by independent accountants, by reason of the discovery of loss sustained by the **Insured**. Such "reasonable expenses" shall not include

wages paid to **Employees** of the **Insured**, except overtime wages paid to such **Employees** or extra **Employees** while necessarily working solely in an effort to establish the claim.

# Professional @vantage
for Financial Institutions

**Financial Institution Bond**                                    **II. Additional Benefits**

**(A) COURT COSTS AND ATTORNEY'S FEES – NOTICE OF LEGAL PROCEEDINGS AGAINST INSURED – ELECTION TO DEFEND**

The Underwriter may at its sole discretion indemnify the **Insured** against court costs and reasonable attorneys' fees incurred and paid by the **Insured** in defending any suit or legal proceeding brought against the **Insured** to enforce the **Insured's** liability, or alleged liability, on account of any loss, claim or damage which, if established against the **Insured**, would constitute a collectible loss under this Bond in excess of any Deductible Each and Every Loss. Such indemnity shall be a part of the Single Loss Limit of Indemnity for the applicable Insuring Agreement or Coverage.

The **Insured** shall notify the Underwriter at the earliest practicable moment not to exceed sixty (60) days after notice thereof, of any such suit or legal proceeding and at the request of the Underwriter shall furnish it with copies of all pleadings and other papers therein. At the Underwriter's election the **Insured** shall permit the Underwriter to conduct the defense of such suit or legal proceeding, in the **Insured's** name, through attorneys of the Underwriter's selection. In such event, the **Insured** shall give all reasonable information and assistance, other than pecuniary, which the Underwriter shall deem necessary to the defense of such suit or legal proceeding.

If the amount of the **Insured's** liability or alleged liability is greater than the amount recoverable under this Bond, or if a Single Loss Deductible Amount is applicable, or both, the liability of the Underwriter under this Additional Benefit is limited to the proportion of court costs and attorneys' fees incurred and paid by the **Insured** or by the Underwriter that the amount recoverable under this Bond bears to the total of such amount plus the amount which is not so recoverable.

If the Underwriter pays court costs and attorneys' fees in excess of its proportionate share of such costs and fees, the **Insured** shall promptly reimburse the Underwriter for such excess.

**(B) INDEMNITY FOR INJURY OR DEATH OF DIRECTORS OR EMPLOYEES**

**(1)** Payments of Money that the **Insured**, in its own discretion, shall make to any of its directors or **Employees**, who, during the term of this Bond and while performing any service anywhere for the **Insured**, shall have sustained bodily injury inflicted by any person while such person is committing or attempting to commit any act of larceny, theft, robbery or burglary; provided, that the Underwriter's maximum liability for the total payments made to any one director or **Employee** shall be limited to no more than $500.00 a week during the period the director or **Employee** requires medical or surgical treatment, hospital confinement or the services of a trained nurse, as a result of injury inflicted during any one such event, and in any event such payments shall not exceed a total of $10,000.00.

**(2)** Payments of Money that the **Insured**, in its own discretion, shall make on behalf of its directors or **Employees** who, during the term of this Bond, were performing any service anywhere for the **Insured**, and shall have died as the result of any bodily injury inflicted by any person while such person is committing or attempting to commit any act of larceny, theft, robbery or burglary; provided, such payments shall not exceed $10,000.00, and shall be reduced by any amounts paid under part (1) above.

**(C) REIMBURSEMENT FOR REWARD PAYMENTS**

The Underwriter agrees to indemnify the **Insured** up to an amount of $10,000.00, per event, for any reward(s) paid by the **Insured** for information leading to the capture or apprehension of any person(s) who, while this Bond is in effect, shall have robbed any of the **Insured's** messengers, or robbed or burglarized any of the **Insured's Premises** or offices, or shall have made an attempt thereat.

# Professional @vantage
## for Financial Institutions

### Financial Institution Bond

III. Definitions

As used in this Bond:

(1) **Acceptance** means a **Written** draft which the drawee has, by signature **Written** thereon, engaged to honor as presented.

(2) **Account Code** means a confidential and protected string of characters which identifies or authenticates a person, and permits that person to gain access to a **Voice Computer System** for the purpose of making toll calls or utilizing voice mailbox messaging capabilities or other similar functional features of the **Voice Computer System**.

(3) **Authoritative Copy** means the copy of an **Electronic Note** that meets the requirements for control established in Section 201(c) of the federal Electronic Signatures in Global and National Commerce Act.

(4) **Automated Teller Machine** means any automated mechanical devices which, on behalf of the **Insured**, disburse **Property**, accept deposits, cash checks, drafts or similar **Written** instruments, or make credit card loans.

(5) **Bond Period** means the period of one year following the effective date and time of this Bond or any annual anniversary thereof, or, if the time between the effective or annual anniversary date and the termination date of this Bond is less than one year, then such lesser period.

(6) **Certificate** means a **Computer**-based record or electronic message that complies with ANSI Standard X.509 Version 3 or higher, or any successor standard, and that:
   (a) identifies the **Certification Authority** issuing it;
   (b) names or identifies the maker, drawer, issuer, endorser, assignor or any person signing in any other capacity (certificate holder);
   (c) contains the public key of the certificate holder;
   (d) identifies the **Certificate's** period of validity;
   (e) is digitally signed by a **Certification Authority**; and
   (f) has the meaning ascribed to it in accordance with applicable standards.
   A **Certificate** includes not only its actual content but also all documents expressly referenced or incorporated in it.

(7) **Certificate of Deposit** means an acknowledgment in **Writing** by a financial institution of receipt of **Money** with an engagement to repay it.

(8) **Certificate of Origin or Title** means a **Written** document issued by a manufacturer of personal property or a governmental agency evidencing the ownership of the personal property and by which ownership is transferred.

(9) **Certificated Security** means a share, participation or other interest in property of, or an enterprise of, the issuer or an obligation of the issuer, which is:
   (a) represented by an instrument issued in bearer or registered form;
   (b) of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and
   (c) either one of a class or series or by its terms divisible into a class or series of shares.

(10) **Certification Authority** means an entity, other than a natural person, that creates, issues, manages and revokes **Certificates** and has agreed to be bound by the rules of a **Policy Management Authority**.

(11) **Check Kiting Fraud** means a fraud that is perpetrated by a depositor of the **Insured** who establishes two or more accounts in different institutions, one of which is an **Insured** hereunder, and making constant, systematic, back and forth deposits between such accounts utilizing checks of approximately the same amount to create the appearance of valid funds in the account(s), and involve **Insured** deposits drawn against uncollected funds deposited in another institution to create the appearance of valid funds in the account at the other institutions, provided:
   (a) such deposits are made by the **Insured's** customer with the clear and obvious intent to defraud the **Insured**; and
   (b) the **Insured** is, in fact, deceived by such deposits.

(12) **Computer** means data processing equipment, communication lines (including telephone lines, coaxial cables, satellite, microwave, radio wave, or fiber optic transmission), data elements and program logic, located:
   (a) in an office or **Premise** of the **Insured**;
   (b) at an **Electronic Data Processor** with whom the **Insured** has contracted for data processing services (including other financial institutions); or
   (c) at an automated clearing house (including a Federal Reserve Bank), or other electronic communications system (including but not limited to Fedwire, Clearing House Interbank Payment System (CHIPS) and Society for Worldwide International Financial Telecommunication (SWIFT));
   whether owned or leased.